## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

ESTATE OF BERNARD J. SHERLIP, and
THE BARRETT LIVING TRUST, on behalf
of themselves and all others similarly situated,

        Plaintiffs,

   v.

MORGAN STANLEY and
MORGAN STANLEY SMITH BARNEY
LLC,

      Defendants.

Case No. 1:24-CV-04571-VEC

**JURY TRIAL DEMANDED**

### FIRST AMENDED CLASS ACTION COMPLAINT

1.      This class action arises out of Morgan Stanley's drastic under-payment of interest to its own clients in its bank cash sweep program.  Morgan Stanley underpaid its clients in violation of its fiduciary and contractual duties in order to enrich itself at its clients' expense.  Rather than pay its clients a "reasonable" rate of interest on their cash that properly took into account "prevailing" or "current" "market conditions" or "competitive interest rates," as it was required to do, Morgan Stanley instead paid miniscule rates to its clients while it earned hundreds of millions of dollars on that cash due to rising interest rates.

2.      In a typical cash sweep program for a brokerage client, the brokerage firm moves uninvested cash from the client's brokerage account into an interest-bearing account that generates returns for the client.  When Morgan Stanley sweeps its clients' cash through its bank cash sweep program, Morgan Stanley uses that cash to generate returns for itself, due to the spread between

the interest income that Morgan Stanley earns on the cash and the amount of interest that it pays its clients.

3.      Morgan Stanley is required to act as a fiduciary in the best interests of its clients, including within the scope of its agency relationship with those clients vis-à-vis its cash sweep program.  That includes a duty to put its clients' interests ahead of its own when recommending and/or making investments conducting transactions for them, including transactions within the scope of its cash sweep program.  Morgan Stanley also agreed to provide to certain clients a "reasonable rate of interest" on the swept cash, and promised all clients that the interest rates it set on the cash sweep program would take into account "current market conditions" and "competitive interest rates."  In addition, under the law, the agreement between Morgan Stanley and its clients carries with it an implied covenant of good faith and fair dealing.  That includes an implied promise that neither party will do anything to frustrate the fruits of the clients' bargain with Morgan Stanley.

4.      Rather than act as a fiduciary in the best interests of Morgan Stanley's account holders or fulfill its contractual and implied covenant obligations to its clients, Morgan Stanley used its clients' funds to enrich itself at their expense.

5.      Rising interest rates presented an opportunity for Morgan Stanley clients to earn more on their cash sweep account balances.  By improperly keeping the interest rates paid on bank cash sweep accounts artificially low, Morgan Stanley usurped that opportunity for itself, leveraging its clients' cash for its own benefit and earning outsized returns year after year.

6.      Morgan Stanley's sweep interest rates—which it has kept largely static over the past several years—have ignored current market conditions.  For example, the yield on short-term U.S. Treasury bills increased dramatically over the past two years, and it has been above 5.25% for most of the past year.  By contrast, Morgan Stanley pays (and has for years paid) many of its

clients with cash sweep accounts an interest rate of only 0.01%, which has remained unchanged since 2020.  For context, that is approximately *1/500th* of the current short-term Treasury Bill rate.

7.     There is nothing "reasonable" or fair about the rates Morgan Stanley paid to its clients or about Morgan Stanley using its clients' cash balances to reap windfall profits at these disproportionate spreads.  Nor does Morgan Stanley set its sweep interest rates based on competitive interest rates.  Brokerages that do ***not*** sweep their cash to affiliated banks (as Morgan Stanley does) pay far higher interest rates than Morgan Stanley.

8.     Morgan Stanley's sweep rates are also drastically lower than the average rates that brokerages nationwide pay on sweep programs.  In fact, Morgan Stanley's practices related to its bank cash sweep accounts have come under scrutiny from the U.S. Securities and Exchange Commission (the "SEC"), which has launched an investigation into the bank cash sweep program that Morgan Stanley made its clients' default option.

9.     Morgan Stanley's misconduct constituted a breach of its fiduciary duties, a breach of its contracts with accountholders, and a breach of the implied covenant of good faith and fair dealing—and it was particularly harmful to its clients who, like all other Americans, have suffered through record inflation over the past few years. Plaintiffs, individually and on behalf of the proposed Class defined herein, bring this class action to remedy the significant financial harm caused by Morgan Stanley's misuse of its cash sweep program to enrich itself at the expense of its own clients.

I.     **PARTIES**

10.     Plaintiff, the Estate of Bernard J. Sherlip (the "Sherlip Estate"), is the Estate of Bernard Sherlip, who was a physician and resident of Fairfield, Connecticut, who passed away in March of 2023. His Estate is administered by his daughters, Susanne Sherlip Mehlman and Joy

Sabrina Hultman, co-executors appointed by the Probate Court of Fairfield County, Connecticut, on May 4, 2023.  The co-executors of the Estate are not compensated for their work, and they are not professional estate managers. Dr. Sherlip maintained multiple accounts at Morgan Stanley from November 2012 to August 2022, including retirement accounts, retail investor brokerage accounts, and advisory accounts. In each account maintained by Dr. Sherlip with Morgan Stanley, Dr. Sherlip's cash balances were swept into Morgan Stanley's bank cash sweep program throughout the period his accounts were open, up to and including August 2022.

11.    Plaintiff the Barrett Living Trust is a trust created on June 3, 1999.  The Barrett Living Trust maintained a managed account at Morgan Stanley from as early as 2017 to the present.  In this account maintained by the Barrett Living Trust with Morgan Stanley, the Barrett Living Trust's cash balances were swept into Morgan Stanley's bank cash sweep program throughout the period its accounts were open, up to and including the present.

12.    As a result of Morgan Stanley's continuing course of conduct, Plaintiffs and the proposed Class have been damaged, and Morgan Stanley has been unjustly enriched.

13.    Defendant Morgan Stanley is a corporation incorporated in Delaware with its principal place of business in New York, New York.  Morgan Stanley provides financial consulting, wealth management, and advisory services.

14.    Defendant Morgan Stanley Smith Barney LLC ("MSSB") is a registered broker-dealer and investment adviser with the SEC and is a limited liability company organized and existing under the Limited Liability Company Act of the State of Delaware. MSSB provides wealth management services to Morgan Stanley clients, including Plaintiffs and other members of the proposed Class. MSSB maintains its principal place of business in New York, New York.

15.     As used in this Complaint, the term "Morgan Stanley" collectively refers to Morgan Stanley and MSSB.

## II.     RELATED ENTITIES NOT NAMED AS PARTIES

16.     Although not named as defendants, certain affiliated entities are discussed herein, including Morgan Stanley Bank and Morgan Stanley Private Bank. Both of these entities are wholly-owned subsidiaries of Morgan Stanley and they knowingly participated in and reaped the benefits of the wrongful conduct alleged herein, which included acting as banks to which Morgan Stanley swept Class members' cash as part of Morgan Stanley's Bank Deposit Program.

## III.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction of this action under the Class Action Fairness Act, codified at 28 U.S.C. § 1332(d). The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiffs and other class members are citizens of States different from Defendants.

18.     This Court has personal jurisdiction over Defendants because they conduct substantial business in this District and they have their principal places of business here.

19.     Venue is proper in this District under 28 U.S.C. § 1391.

## IV.     MORGAN STANLEY'S CASH SWEEP ACCOUNT MISCONDUCT

20.     Morgan Stanley is a global financial services firm that manages and distributes capital for its clients, including individuals.[1]

21.     A significant source of income for Morgan Stanley is Net Interest Income ("NII"), which is the difference between the interest Morgan Stanley earns on cash balances through loans and investments, and the amount it pays to its clients on their cash balances.

---

[1] Morgan Stanley Annual Report Form 10-K (December 2023) at p. 5.

22.     Morgan Stanley generates NII in large part through a "cash sweep" program linked to its clients accounts.

23.     A cash sweep program is a program provided by a brokerage firm where the brokerage firm automatically transfers uninvested cash balances (known as "free credit balances") in its clients' accounts to either a money market product or an account at a bank.

24.     By 2012, Morgan Stanley's cash sweep program, which Morgan Stanley calls its Bank Deposit Program ("BDP"), automatically deposited clients' free credit balances into banks affiliated with Morgan Stanley ("Sweep Banks").

25.     Morgan Stanley's Bank Deposit Program Disclosure Statement (the "Disclosure Statement"), which is incorporated by reference in Morgan Stanley's Client Agreement (the "Client Agreement"), provided:

> Under the Bank Deposit Program (the "Program"), free credit balances in your [accounts] will be automatically deposited into deposit accounts ("Deposit Accounts") established for you by and in the name of Morgan Stanley … at [a bank affiliated with] Morgan Stanley ….

26.     As of the start of the Class Period in October 2018, under the Bank Deposit Program, the only alternative for Plaintiffs and members of the Class was to have their cash swept into deposit accounts inside the BDP.  As of that time, there was no other sweep alternative available (such as a money market fund).  Morgan Stanley referred to the possibility of other alternatives being available, but Plaintiffs and the other members of the Class were ineligible for those alternatives.

27.     Before interest rates rose significantly over the past several years, Morgan Stanley offered a money market fund as an option inside the BDP.  However, when interest rates rose, Morgan Stanley cut off availability of that money market fund to Morgan Stanley clients so that it could reap the benefits of moving those clients into the bank deposit accounts.

28.    Specifically, in June of 2018, Morgan Stanley modified its BDP to make money market funds unavailable to its clients.  Morgan Stanley did so by increasing the dollar amount at which it would sweep client funds into a money market fund from $2 million to an extraordinarily high "Deposit Maximum" of $20 million. That amount is significantly higher than the FDIC insurance limit, which means that clients could have funds at Sweep Banks that were not FDIC-insured before a money market mutual fund became an option.  As Morgan Stanley told clients at the time:

> Currently, the Deposit Maximum is a total deposit amount of $2,000,000.  As a reminder, beginning June 6, 2018, funds will be deposited into the Deposit Accounts up to the **new Deposit Maximum amount of $20,000,000** across both Sweep Banks. . . .  Once your deposits reach the Deposit Limit at both the Primary and Secondary Sweep Banks, available cash will be deposited into your Deposit Accounts at the Primary Sweep Bank, up to the Deposit Maximum, **even if the amounts in the Deposit Accounts at the Primary Sweep Bank exceed the Maximum Applicable Insurance Limit**. . . .
>
> **If your Account is eligible**, the Sweep Fund available for your Account is the Morgan Stanley Institutional Liquidity Funds Government Securities Portfolio (symbol MGPXX).  The Deposit Maximum and the Sweep Fund are subject to change with prior notice to you from Morgan Stanley. . . . As a reminder, beginning June 6, 2018, funds will be deposited into your Deposit Accounts at the Sweep Banks up to the new Deposit Maximum of $20,000,000.[2]

29.    In June 2018, Morgan Stanley moved its clients' balances of between $2 million and $20 million that were in Morgan Stanley's money market fund (MGPXX) from the money market fund into the BDP.  A letter to those clients stated:

> Clients with balances between $2 million and $20 million in MGPXX as of June 6, 2018 **will have those balances placed by Morgan Stanley with the Sweep Banks** (one or more depository institutions affiliated with Morgan Stanley) with a preferred interest rate (the 'Preferred Deposit' that will track the MGPXX yield for an interim period no less than six months.  After the interim period, **the rates will be set consistent with prevailing market conditions**.

---

[2] All emphasis herein is added.

30.     The letter added that, "As a result of this change, clients with balances in excess of $2 million as of June 6, 2018 will have available free credit balances swept to Morgan Stanley Private Bank, National Association up to the deposit limit, then to Morgan Stanley Bank, N.A. up to the revised $20 million deposit maximum."

31.     Thus, Morgan Stanley promised its clients who had balances in MGPXX between $2 million and $20 million that Morgan Stanley was moving their investments into deposits at the Sweep Banks, and that the interest rates paid on such balances "will be set consistent with prevailing market conditions."  As set forth herein, Morgan Stanley breached that contractual agreement by not setting those balances consistent with prevailing market conditions.

32.     Plaintiffs' Client Agreement provided that, "You agree that MSSB is not responsible to you if the Bank Deposit Program has a lower rate of return than the other available sweep investments . . . ."  That reference to other "available" sweep investments was, at the time (October 2012) a reference to the MSSB money market funds because the Disclosure Statement provided in the immediately prior paragraph, "You understand and agree that, if you qualify, you may choose to sweep free credit balances into an affiliated or non-affiliated taxable or tax exempt money market fund (to the extent available) instead of a Sweep Bank account."  However, by June 6, 2018, Morgan Stanley no longer made any money market fund available to its clients as a sweep option.

33.     Thus, by 2018, the provision in the Client Agreement that MSSB would not be responsible if the BDP had a lower rate of return than other "available" sweep investments no longer had any meaning or significance because Morgan Stanley no longer made any other options "available." Plaintiffs are not basing their claims on Morgan Stanley's failure to invest their free cash balances in a money market fund (which, in fact, was not available to them).  Rather, Plaintiffs

allege that the interest rate that Morgan Stanley in fact paid on the cash balances in the BDP was unreasonably and unfairly low, and that Morgan Stanley improperly and unreasonably retained profits derived from its clients' cash balances that it should have passed on to those clients.

34.    In creating and operating its BDP, Morgan Stanley exercises control over what sweep vehicles it makes available to its clients. In addition, in the case of bank deposits with affiliated banks, Morgan Stanley has control over the setting of the interest rates that those banks will pay on clients' cash balances.

35.    The Disclosure Statement provided:

> Interest rates on the Deposit Accounts are variable. Morgan Stanley and the Sweep Banks reserve the right to change the interest rates or the methodology used to determine the interest rates on Deposit Accounts in their sole discretion and without prior notice to you. Interest rates are set on a weekly basis but may be set more or less frequently. ***The interest rate is generally based on a variety of factors, including, but not limited to, current market conditions and competitive interest rates***.

This disclosure states the unremarkable proposition that interest rates within the sweep accounts are "variable." The disclosure also speaks of Morgan Stanley's reservation of the right to change the interest rates and the methodology used to determine the rates. That is similarly unremarkable: Morgan Stanley does not require explicit permission from its clients each time it changes the interest rates on the swept cash.

36.    The Disclosure Statement further provides that, in exercising its "sole discretion" to set the interest rate paid on the swept cash, Morgan Stanley will make that determination "generally based on a variety of factors, including, but not limited to, current market conditions and competitive interest rates." That promises to clients that, regardless of the specific methodology Morgan Stanley might employ, the methodology will take into account "current market conditions" and "competitive interest rates." Such promise existed as of 2012 and it exists in the Disclosure Statement available on Morgan Stanley's website today. The above language

9

does not modify, or speak to, the substantive requirement, discussed below, that the interest rates on the swept cash must be reasonable.

37.    Contrary to Morgan Stanley's promises, during times of increased interest rates, Morgan Stanley has not paid clients a fair or reasonable rate of interest on their swept cash, and Morgan Stanley in fact ignored the "current" "prevailing" "market conditions" and "competitive interest rates." Merely by way of example, and without limitation, since 2022, the Federal Funds Rate – the interest rate at which banks lend to one another – increased significantly from a low of 0.08% to a high of 5.33% in 2024. However, Morgan Stanley failed to secure and pay increasing interest rates on its clients' swept cash, which Morgan Stanley deposited with its affiliate banks. Indeed, Morgan Stanley maintained flat BDP rates for years, at a fraction of a percent, continuing to secure high interest returns for itself on the cash but paying far less than a fair and reasonable rate to clients—thereby retaining the sharply increased spread for itself. This is reflected in the graph below comparing the Federal Funds Rate to Morgan Stanley's cash sweep interest rate on its lowest tier clients' accounts (i.e., cash deposits up to $99,999):



38.     As this graph illustrates, Morgan Stanley derives significant profits from having its clients' funds invested through its "default" cash sweep program because Morgan Stanley and its affiliates pay drastically low interest rates on the clients' cash balances that are neither fair or reasonable, and in violation of its legal, contractual and implied duties.

**A.     The SEC Is Investigating Morgan Stanley's Cash Sweep Program and Morgan Stanley Recently Changed Certain Rates for Wealthy Clients**

39.     On August 5, 2024, Morgan Stanley filed a quarterly report with the SEC in which it stated, "[s]ince April 2024, the Firm has been engaged with and is responding to requests for information from the Enforcement Division of the SEC regarding advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940."

40.     Prior to the public announcement of the SEC's investigation, on July 23, 2024, Morgan Stanley announced that it was increasing the interest rate Morgan Stanley pays to only certain wealthier clients on swept cash in their advisory accounts to 2%.   Morgan Stanley

executives, on July 16, 2024, during the company's second quarter earnings call, attributed that increase to the "changing competitive dynamics."

41.    Thus, after Morgan Stanley was under investigation by the SEC, it increased the interest rate it paid on only certain cash sweep accounts held by wealthier clients, purportedly in order to take into account the type of "competitive" dynamics it had told clients all along that it included in its methodology to set cash sweep interest rates.  This change acknowledged that Morgan Stanley was not previously taking into account "changing competitive dynamics" when setting the interest rate on sweep accounts.

42.    Morgan Stanley's recent interest rate change was insufficient to bring Morgan Stanley into compliance with its contractual and fiduciary duties for several reasons, including that (i) the rate increase was limited to only a fraction of its clients (specifically wealthy advisory clients); and (ii) the 2% rate applied to those clients was still unfairly and unreasonably low in light of prevailing market conditions and competitor interest rates.

43.    As financial industry publication AdvisorHub reported on July 23, 2024: "The change, which will apply to balances over $250,000 that are swept to the firm's Bank Deposit Program, will take effect August 1."  This "***marks a dramatic increase from the 0.01% annual yield that the firm currently offers*** on a $250,000 account but ***still less than half of the roughly 5%*** clients could earn in some money market funds."

44.    Securities analysts who cover Morgan Stanley were dissatisfied with Morgan Stanley's increase in sweep interest rates, as well as the limited scope of the increase, including that it was focused exclusively on wealthier clients with large cash balances. As an analyst from Wolfe Research wrote on July 24, 2024, the rate increase by Morgan Stanley was only a "***half measure***."  A Deutsche Bank analyst likewise asked rhetorically in an analyst report dated August

12, 2024, "*How many deposits does this relate to and why just 2% vs. 5% for money market funds?*"

45.     Analysts further noted that the change in interest rate only impacted a small number of Morgan Stanley clients.  Reporting on Morgan Stanley's "announcement that they plan to pay higher rates on certain advisory sweep deposits," Evercore ISI analysts wrote on July 17, 2024, "We would feel better if MS told us this true-up repricing encompassed *fairly paying all deposits in all advisory accounts*."  Analysts at JPMorgan similarly wrote on July 17, 2024, that "we anticipate the company is only changing pricing on a relatively small percentage of fee-based assets."  Deutsche Bank also reported on August 12, 2024, that "sweep balances that are being repriced are in the adviser-led channel which is *a small amount of the overall bank deposits*."

**B.     Morgan Stanley's Bank Deposit Program Captures Clients' Profits for Morgan Stanley**

46.     Morgan Stanley established, implemented, and maintains the BDP to maximize its profits through increased NII by paying clients unreasonably low interest rates while keeping almost all of the interest earned at significantly higher rates for itself.

47.     Morgan Stanley's BDP is the sweep vehicle for otherwise uninvested "end of day cash held in brokerage and/or investment advisory accounts."[3]

48.     Through its Client Agreement and by offering the BDP as the default and only sweep vehicle, Morgan Stanley recommends to its clients who have otherwise uninvested cash that they automatically deposit or "sweep" their "free credit balance" into "cash sweep accounts" at Morgan Stanley's Sweep Banks.

---

[3] *See* Morgan Stanley Client Relationship Summary (January 4, 2024), at p. 2. Available at https://www.morganstanleyclientserv.com/publiccontent/msoc/pdf/ClientRelationshipSummary.pdf (last visited September 23, 2024).

49.    The BDP is Morgan Stanley's "designated sweep investment" by default for all eligible brokerage and advisory accountholders, including retirement accountholders.

50.    Morgan Stanley's Disclosure Statement provides that Morgan Stanley operates as its clients' agent, and thus fiduciary, with respect to the BDP. As the Disclosure states:

**Your Relationship with Morgan Stanley and the Sweep Banks**

The Program is being offered to you by Morgan Stanley, acting as your agent and custodian in establishing the Deposit Accounts at each Sweep Bank and depositing funds into, withdrawing funds from, and transferring funds among, the Deposit Accounts at each Sweep Bank.

51.    The Disclosure Statement further provides that "Morgan Stanley will ***remain the agent and custodian*** for all your deposits in the Program, including those swept to one or more Program Banks." As such, Morgan Stanley operates as an agent and fiduciary in selecting the banks and accounts for all account holders who have cash balances swept into the BDP.

52.    In July 2012, the Disclosure Statement similarly provided that "The Deposit Accounts at each Sweep Bank are established in the name of Morgan Stanley Smith Barney, ***as agent and custodian for its clients***." The Disclosure Statement further provided that "Morgan Stanley Smith Barney, ***as your agent,*** will deposit your available cash into your Deposit Accounts," and that "The Program is being offered to you by Morgan Stanley Smith Barney and ***we are acting as your agent*** and custodian in establishing the Deposit Accounts to each Sweep Bank and depositing funds into, withdrawing funds from and transferring funds among the Deposit Accounts at each Sweep Bank and among Sweep Banks."

53.    Prior to March 2023, Morgan Stanley deposited its clients' free credit balances only at banks affiliated with Morgan Stanley.

54.    After March 2023, Morgan Stanley began sweeping certain client free credit balances to a non-affiliated "Program Bank," but ***only*** if a client's cash funds exceeded the FDIC

limit in the affiliated Morgan Stanley banks.  Citibank N.A. (previously an affiliate bank) is the only Program Bank listed by Morgan Stanley as of March 2023 through September 2024.  As Morgan Stanley stated in its September 2022 Bank Deposit Program Disclosure Statement, it "added Program Banks to the [BDP] in order to maximize the funding value of the deposits in the Program for the Morgan Stanley Sweep Banks."  It further explained in the December 2023 Disclosure Statement that, "[i]n return for receiving deposits through the Program, the Program Banks provide other deposits to the Morgan Stanley Sweep Banks" and that "this reciprocal deposit relationship provides a low-cost source of funding, and capital and liquidity benefits to both the Program Banks and the Morgan Stanley Sweep Banks."

55.     For all relevant time periods, Morgan Stanley failed to pay to, or secure for, its clients with cash sweep balances a fair or reasonable rate of interest on those balances that took into account "current market conditions" or "competitive interest rates."

56.     Morgan Stanley's Client Agreement and Disclosure Statements do not specify the applicable interest rates. Instead, Morgan Stanley directs clients to a website to obtain current interest rate information. As of March 5, 2024, those miniscule, below-market rates were the following:[4]

| From | To | 2024 Annual Percentage Yield |
|---|---|---|
| $0 | $99,999 | 0.01% |
| $100,000 | $249,999 | 0.01% |
| $250,000 | $499,999 | 0.01% |
| $500,000 | $999,999 | 0.05% |
| $1 million | $1,999,999 | 0.15% |
| $2 million | $4,999,999 | 0.30% |
| $5 million | $9,999,999 | 0.50% |
| $10 million | and above | 0.50% |

[4] Bank Deposit Program Rate Monitor (March 5, 2024), available at https://www.morgan stanley.com/wealth-general/ratemonitor (accessed April 23, 2024).

57.     As discussed above, Morgan Stanley increased the interest rate paid on investment advisory accounts with greater than $250,000 in eligible deposits as of August 1, 2024. However, before August 1, 2024, such clients were only paid the above low rates, and this change did not apply to non-advisory accounts, or advisory accounts with less than $250,000 in available balances.

58.     By comparison, as of March 2024, the Federal Fund Rate was 5.33%, and the 30-day yield on Morgan Stanley's Institutional Liquidity Funds - Government Securities Portfolio (MGPXX) was 4.89%.[5]

59.     Over the past several years, Morgan Stanley's cash sweep rates have been artificially low.  Below is a chart listing exemplary Annual Percentage Yield rates in each of the previous seven years:

| From | To | 2024 APY | 2023 APY | 2022 APY | 2021 APY | 2020 APY | 2019 APY | 2018 APY | 2017 APY |
|------|-----|------|------|------|------|------|------|------|------|
| $0 | $99,999 | .01% | .01% | .01% | .01% | .01% | .03% | .15% | .03% |
| $100,000 | $249,999 | .01% | .01% | .01% | .01% | .01% | .03% | .15% | .06% |
| $250,000 | $499,999 | .01% | .01% | .01% | .01% | .01% | .05% | .25% | .1% |
| $500,000 | $999,999 | .05% | .05% | .05% | .01% | .01% | .05% | .25% | .15% |
| $1 million | $1,999,999 | .15% | .15% | .15% | .01% | .01% | .1% | .5% | .25% |
| $2 million | $4,999,999 | .30% | .3% | .3% | .01% | .01% | .2% | .75% | .45% |
| $5 million | $9,999,999 | .5% | .5% | .5% | .01% | .01% | .2% | .75% | .45% |
| $10 million | and above | .5% | .5% | .5% | .01% | .01% | .2% | .75% | .45% |

---

[5] *See* https://www.morganstanley.com/im/en-us/registered-investment-advisor/product-and-performance/liquidity-funds/liquidity/government-securities.shareClass.PT.html.

C.    **Morgan Stanley Has Several Independent Duties and Obligations to Its Clients**

60.    As a registered investment adviser and broker-dealer, and acting as an agent for its clients with respect to the BDP, Morgan Stanley owes duties to its clients, as well as contractual obligations and obligations implied under the law.

61.    MSSB is a registered investment adviser bound by the fiduciary duties imposed on it by the Investment Advisers Act of 1940, including duties of care and loyalty.  This includes a duty for MSSB to act in the best interests of its clients, and to place the best interests of its clients ahead of its own self-interest.  Similar duties are imposed on Morgan Stanley under principles of broker-dealer law and as an agent of its clients vis-à-vis the BDP cash sweep program.

62.    For all retail retirement accounts (managed or non-managed), including traditional, Roth, and Simple Individual Retirement Accounts ("IRAs"), Morgan Stanley was contractually obligated to pay to or secure for its clients a "reasonable rate of interest" on the clients' cash balances.

63.    For all retail advisory (or managed) accounts (including advisory IRAs), Morgan Stanley was required to act as a fiduciary to its clients with respect to all aspects of the accounts, including the cash sweep program, pursuant to the Investment Advisers Act of 1940.

64.    For all retail accounts, Morgan Stanley acknowledged that it was an "agent" for its clients with respect to the BDP, and, as a result, Morgan Stanley was required to act as a fiduciary for its clients as its principals with respect to the BDP.

65.    For all retail accounts, Morgan Stanley promised that the interest rate on its cash sweep accounts "is generally based on a variety of factors, including, but not limited to, current market conditions and competitive interest rates." In addition, for all Morgan Stanley clients who previously held shares in the MGPXX money market fund, and whom Morgan Stanley transitioned

out of that fund and into its BDP on June 6, 2018, Morgan Stanley promised that the interest rates on their swept cash "***will be set consistent with prevailing market conditions***."

66.    In addition, for all retail accounts, including those that that lack an express contractual provision requiring the payment of a "reasonable rate of interest," regardless of whether the account was an advisory or brokerage account, Morgan Stanley is bound under New York law by the implied covenant of good faith and fair dealing to pay its clients with sweep accounts a reasonable rate of interest.

67.    Morgan Stanley breached its express and implied contractual duties and fiduciary duties to its clients by failing to pay to, or secure for, them a reasonable rate of interest on their cash sweep balances. Morgan Stanley further breached its express and implied contractual duties and fiduciary duties to its clients by, among other things: (i) structuring the BDP so as to place client assets in the BDP and pay clients artificially low interest rates when enrolled so as to benefit Morgan Stanley to its clients' detriment; (ii) failing to further increase the interest rates paid on sweep account balances despite "prevailing" or "current market conditions" starting by October 17, 2018, and ending in early 2020, marked by increased interest rates in the industry and as paid by brokerages with sweep accounts that swept cash to non-affiliated banks; (iii) failing to further increase the interest rates paid on sweep account balances despite "prevailing" or "current market conditions" starting in mid-2022 through the present, marked by increased interest rates in the industry and as paid by brokerages with sweep accounts that swept cash to non-affiliated banks; (iv) failing to properly take into account "competitive interest rates" when setting sweep account interest rates; and (v) attempting to insert into client disclosures terms that attempt to eliminate or minimize Morgan Stanley's contractual or legal obligations to provide reasonable interest to its

clients that properly considers the interest rate environment, prevailing market conditions, and competitors' rates when setting cash sweep interest rates.

### 1.    Morgan Stanley Has Fiduciary Duties to Its Clients

68.    As an investment adviser for its clients, Morgan Stanley must adhere to certain standards of care and conduct.

69.    Specifically, for its advisory clients (including its advisory IRA accountholders), Morgan Stanley owes its clients a fiduciary duty under the Investment Advisers Act of 1940, which is based on equitable common law principles and fundamental to its relationship with its clients. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

70.    Under this fiduciary duty, Morgan Stanley "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.*

71.    If there is a conflict between its interests and its client's interests, then Morgan Stanley is also required to "eliminate or make full and fair disclosure of all conflicts of interest which might incline an adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict." *Id.*

72.    Where Morgan Stanley "cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent," then Morgan Stanley "should either *eliminate* the conflict or adequately *mitigate* (*i.e.*, modify practices to reduce) the conflict[.]" *Id.* (emphasis in the original).

73.    Morgan Stanley owes substantially similar duties to its brokerage clients under broker-dealer rules and regulations, *see* Reg. BI, 17 C.F.R. § 240.15l-1, 84 Fed. Reg. 33318-64,

which Morgan Stanley expressly acknowledges and incorporates in its Client Relationship Summary, including an obligation to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation." 84 Fed. Reg. 33318, 33321.

74.    Moreover, in creating and operating its BDP, Morgan Stanley also agreed to act as an agent on behalf of its clients in establishing, maintaining, and operating their cash sweep accounts.

75.    Accordingly, in its capacity as an adviser, broker, and agent in exercising complete control in creating, offering, automatically enrolling, and establishing cash sweep accounts under the BDP, Morgan Stanley assumed fiduciary and other substantial duties of loyalty and care to its clients.

### 2.    Morgan Stanley Has a Contractual Obligation to Pay and Secure Reasonable Interest Rates

76.    For client cash balances maintained in retirement accounts (regardless of whether the accounts are advisory or brokerage in nature), Morgan Stanley may utilize those cash balances for investments or loans, but only if it pays or secures for the client a "reasonable rate" of interest on those cash balances.

77.    Under Morgan Stanley's Individual Retirement Plan (sponsored by MSSB), incorporated in the Client Agreement, the client authorized Morgan Stanley to deposit or invest cash balances in "deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of [MSSB] that bear *a reasonable rate of interest*."[6]

---

[6] Morgan Stanley Individual Retirement Plan (Effective as of October 1, 2012) at ¶¶ 3.3(a), 6.2(g).

78.    This same provision was included in the Morgan Stanley Roth IRA Plan Document and Disclosures and the SIMPLE IRA Plan Document and Disclosures, both of which were effective as of October 1, 2012. The Roth IRA Plan Document and Disclosures provide that a client "authorizes the deposit or investment of cash balances in the Roth IRA" in "deposit accounts with Morgan Stanley Bank, N.A. and or any other banking affiliate of [Morgan Stanley Smith Barney LLC] that bear a ***reasonable rate of interest***."  The SIMPLE IRA Plan Document and Disclosures provide that a client "authorizes the deposit or investment of cash balances in the SIMPLE IRA" in "deposit accounts with Morgan Stanley Bank, N.A. and or any other banking affiliate of [Morgan Stanley Smith Barney LLC] that bear a ***reasonable rate of interest***."

79.    Accordingly, Morgan Stanley and MSSB have explicitly agreed to pay a "reasonable rate of interest" on the cash sweep accounts of their retirement account clients.

80.    These provisions are required to comply with Section 4975 of the Internal Revenue Code ("IRC"), which Morgan Stanley expressly incorporated into its Client Agreement.  IRC Section 4975 taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account."  26 U.S.C. § 4975(c).

81.    A "disqualified person" includes companies or individuals "providing services to the plan."[7]  26 U.S.C. § 4975(e)(2)(B).  This includes banks that receive deposits swept from Morgan Stanley client accounts; in this case, the "Sweep Banks."

82.    The Internal Revenue Code provides several "exemptions" or safe harbors for these "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits

---

[7]  "Plan" is defined as including "an individual retirement account described in Internal Revenue Code § 408(a)."  26 U.S.C. § 4975(e)(1)(B).

which bear a reasonable interest rate in a bank or similar financial institution."  26 U.S.C. § 4975(d)(4).

83.    The objective of this provision is to ensure that related party transactions—i.e., transactions between a plan sponsor (Morgan Stanley) and a service provider (the "Sweep Banks")—concerning retirement accounts are priced at fair market rates.

84.    Treasury regulations extend this same obligation to situations when Morgan Stanley "invests plan assets in deposits in itself or its affiliates."  26 CFR § 54.4975-6(b)(3)(i).  When this occurs, the client's authorization "must name" the institution and "must state that [the bank] may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." *Id*.

85.    Because the BDP is the "default" cash investment vehicle for ***all*** brokerage and advisory accounts, including retirement accounts, these "reasonable rate" provisions are incorporated into the BDP and equally applicable to all accounts.

86.    Morgan Stanley thus has both legal and contractual duties to act in the best interests of its clients vis-à-vis its cash sweep program and to pay reasonable interest rates on its clients' cash balances.

### 3.    Morgan Stanley Has a Contractual Obligation to Base Its Sweep Account Interest Rates on "Prevailing" and "Current" "Market Conditions" and "Competitive Rates"

87.    Morgan Stanley's Disclosure Statement dated July 2012 provides that the interest rate paid on deposit accounts "***is generally based*** on a variety of factors including, but not limited to, ***current market conditions and competitive rates***."  Later versions of the Disclosure Statement contained substantially the same promise, including the most recent Disclosure Statement dated July 2024, which provides that, "The interest rate is generally based on a variety of factors, including, but not limited to, ***current market conditions and competitive interest rates.***"

88.     In addition, as set forth above, for all Morgan Stanley clients who previously held shares in the MGPXX money market fund, and whom Morgan Stanley transitioned out of that fund and into its BDP on June 6, 2018, Morgan Stanley promised that the interest rates on their swept cash "***will be set consistent with prevailing market conditions***."

89.     By reasonable and necessary implication, in a high interest rate environment, the interest rate paid to clients in Morgan Stanley cash sweep accounts must reflect those market conditions and be "competitive" with other benchmark interest rates, which includes the rates paid by brokerages who sweep cash to non-affiliated banks.

### 4.     Morgan Stanley's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for Morgan Stanley to Provide Clients with a Reasonable Rate of Interest

90.     Under New York law—which governs Morgan Stanley clients' agreements regarding their cash sweep accounts—all contracts contain an implied covenant of good faith and fair dealing, which encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included.  This implied covenant includes but is not limited to a pledge that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

91.     In failing to secure for or pay to its clients a fair and reasonable rate of interest, Mogan Stanley breached the implied covenant of good faith and fair dealing.

### D.     Morgan Stanley Breaches Its Duties, Contracts and the Implied Covenant, and Profits Thereby

92.     Morgan Stanley breaches its duties and agreements to secure reasonable interest rates for its clients' deposits, as well as its promises to base its BDP interest rates on "current" and "prevailing" "market conditions" and "competitive rates," and its implied covenant to pay its clients a reasonable rate of interest.

93.     The term "reasonable" is not defined in Morgan Stanley's contracts, but according to the term's dictionary definition, it is synonymous with "fair" and "proper."

94.     IRS regulations define an "arm's-length interest rate" as:

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 CFR § 1.482-2(a)(2).

95.     In 2003, the Department of Labor issued an exemption to certain transactions and, in granting the exemption, gave the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, at 34648 (June 10, 2003).

96.     Under these terms, and any reasonable understanding of what a "reasonable" rate of interest is, Morgan Stanley did not secure or pay a reasonable rate of interest to its clients, including Plaintiffs and Class members.  Nor did Morgan Stanley base its sweep account interest rates on competitive rates.  This is supported by reference to other leading indicators of interest rates being paid during this time period.

### 1.    Sweep Account Rates Paid by Other Institutions

97.     The interest rates paid by other brokerages that sweep cash further demonstrate that the interest rates paid to Morgan Stanley cash sweep accountholders were not fair or reasonable.  This includes brokerages that sweep cash to a bank that is not affiliated with the brokerage, including firms like Fidelity.

98.     As shown in the graph below, an index of interest rates paid by five brokerages that did ***not*** sweep client cash balances to a bank affiliated with the brokerage more closely tracks the movement of the Federal Funds Rate (set forth above) than Morgan Stanley's stagnant cash sweep rates. By contrast, the interest rate that Morgan Stanley paid its clients was much lower and, during much of the time period in question, ***flat***:



99.     As shown in the above graph, there was a time in early to mid-2018 when Morgan Stanley's sweep interest rates increased, albeit by a miniscule amount. However, by October 17, 2018, Morgan Stanley's rates stopped increasing, and plateaued in comparison to the unaffiliated index. In addition, starting in mid-2022, Morgan Stanley's sweep rate stayed consistently low while the rates paid by banks that were unaffiliated with brokerages increased consistent with the market.

100.    Specific firms that swept cash to unaffiliated banks paid interest rates that more closely resembled arm's-length negotiations, and therefore at least partially reflected the prevailing market conditions, compared to the rates paid by Morgan Stanley.

101.    For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and they have consistently paid significantly higher rates of interest than Morgan Stanley. At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of asset tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million).  Morgan Stanley, in contrast, paid 0.01% to 0.5% on all cash balances as of year-end 2022.  As mentioned above, Class members' cash balances in the Morgan Stanley sweep program were allocated to Morgan Stanley Bank, and, if necessary, Morgan Stanley Private Bank.  Both such banks are currently utilized by Fidelity as program banks in Fidelity's sweep program, but Fidelity currently credits interest at 2.44% for its clients in these same program banks. This is in stark contrast to the .01% that Morgan Stanley credits to *its own clients* out of the interest paid to it by *the very same banks*.

102.    Additional examples include Robinhood's rate of 4.9% for Robinhood Gold members as of July 27, 2023, and WeBull's rate of 5%.

103.    Similarly, Fidelity and R.W. Baird have significantly increased the rates they paid on swept cash.  As of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of asset tier, and R.W. Baird paid between 2.03% interest (on cash balances up to $1 million) and 4.11% interest (on cash balances above $5 million).  In comparison, as of year-end 2023, Morgan Stanley paid only 0.01% to 0.49% on all cash balances.

104.    In addition, the interest rate offered by Vanguard on its sweep program is 4.15% regardless of asset tier, and the interest rate offered by Dreyfus is 2.55% regardless of asset tier.

105.    A comparison of Morgan Stanley's sweep account interest rates paid in the BDP to

an industry-wide analysis of 300 sweep programs also shows that Morgan Stanley's rates were

unreasonably low, and that Morgan Stanley did not base its sweep interest rates on prevailing or

current market conditions or competitive rates.  This graph compares Morgan Stanley's .01% rate

that it pays on accounts up to $499,999 (orange line) to the average rate that other sweep programs

nationwide have paid on both (i) the lowest tier of deposits (blue line); and (ii) a middle tier of

deposits up to $499,999 (green line).



106.    The rates depicted by the blue and green lines above are ***conservatively low***

comparators because:  (i) they represent averages across many brokerages, some paying reasonable

rates, and some not; (ii) other comparators are more appropriate, including when one compares

Morgan Stanley to brokerages that sweep to unaffiliated banks (as set forth above); (iii) Morgan

Stanley promised to take into account the current interest rate environment, which includes the

Federal Funds Rate, and the Treasury yield, and which was much more favorable than Morgan

Stanley's sweep rates offered; (iv) the rates represented by the green and blue lines are below the 2% rate to which Morgan Stanley recently changed its own sweep account interest rates for wealthier clients with advisory accounts; and (v) fact and expert discovery will examine and address the appropriate comparators, Morgan Stanley's interest rate methodology and what experts opine was the reasonable rate.

107.    But, as these data show, other brokerage and advisory financial institutions that have cash sweep programs pay significantly higher interest rates than Morgan Stanley did for its own clients.

### 2.    The Federal Funds Rate Benchmark

108.    Strikingly, and contrary to Morgan Stanley's claims that it would factor into its setting of interest rates for its sweep accounts the "prevailing" or "current" "market conditions" or "competitive interest rates," a number of interest rate benchmarks fluctuated wildly over the past several years, but Morgan Stanley's rates did not change (in its lowest asset tiers), or changed by only miniscule amounts (in its higher asset tiers).

109.    The Federal Funds Rate benchmark further demonstrates that the interest rate paid to Morgan Stanley BDP cash sweep accountholders was not reasonable and did not properly take into account the "current" and "prevailing" "market conditions." The federal funds market consists of domestic unsecured borrowings by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises. In other words, it is the market of unsecured borrowing transactions, principally between banks. The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

110.    The Federal Funds Rate increased dramatically in recent years, with an effective rate of 5.33% as of August 28, 2024, for example. The graph below (the same as reproduced above) shows the stark and prolonged increase in the Federal Funds Rate over the past several

years.  By contrast, the interest rates paid to Morgan Stanley cash sweep account holders in the

lowest asset tier have been drastically lower:



111.    The above graph demonstrates that the interest rates Morgan Stanley paid on its

customers' sweep accounts were unreasonably low, especially when considered within "current

market conditions." As shown dramatically by this chart, Morgan Stanley's sweep rate on its

lowest asset tiers did not change despite extraordinary swings in the Federal Funds Rate.

### 3.    The Interest Rates on Sovereign Short-Term Debt Benchmark

112.    The yield on short-term U.S. Treasury Bills also demonstrates that the interest rate

paid on Morgan Stanley cash sweep accounts was not reasonable and did not properly take into

account the "current" and "prevailing" "market conditions."  U.S. Treasury Bills are short-term

securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52

weeks.  They are sold at a discount to their face value, and when they mature, the investor is paid

the face value. Treasury Bills are considered safe investments, but they generally do not produce high returns over time, especially in a low-interest-rate environment.

113.    The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage. As shown in the graph below, over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill: (i) increased from early 2017 through mid-2019; (ii) dropped to close to zero throughout the COVID pandemic (with the shaded area indicating U.S. recession); and (iii) steadily increased from close to zero in early 2022 to approximately 5.5% in mid-2023, and remained at approximately that level through August 2024:



114.    During the entire timeframe when the U.S. Treasury Bill yield was appreciably above zero, the interest rate Morgan Stanley paid to cash sweep account holders remained a tiny fraction of that benchmark.

4.    **The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements**

115.    The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2019 to the present were also significantly higher than Morgan Stanley's cash sweep account interest rates.  This further demonstrates that the interest rate paid on Morgan Stanley cash sweep accounts was not reasonable and did not properly take into account the "current" and "prevailing" "market conditions."

116.    A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities.  In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees to buy it back at a specified date and price.  The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period.  The security serves as collateral for the lender.  A repo can be based on any security, but they usually involve government debt or other debt instruments with steady values.

117.    The overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs.  From April of 2023 through April of 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023.  These rates are significantly higher than the cash sweep interest rates offered by Morgan Stanley.

5.    **Interest Rates Paid on Money Market Accounts**

118.    Money market fund rates also provide a benchmark for determining what does or does not constitute a "reasonable rate," as well as "current" and "prevailing" "market conditions."  Morgan Stanley offers money market sweep investments to its clients, including a money market sweep option that offers a 7-day yield of 4.71% as of October 4, 2024. Other brokerage and advisory firms offer comparable money market funds for clients' cash balances paying similar

rates of interest. Crane's Retail Money Fund Index, for example, included market rates of 4.85% as of August 31, 2024.

### 6.    Fees Paid to Morgan Stanley Brokers and Advisors

119.    The unreasonableness of the rates Morgan Stanley pays to, and secures for, its clients' cash balances is further reflected by considering the fees that Morgan Stanley pays its brokers and advisers for the client cash swept into its BDP.

120.    For example, as noted above, for client cash balances that are less than $500,000, Morgan Stanley pays to, and secures for, its clients an interest rate of 0.01%, or one basis point. However, at the same time, Morgan Stanley credits its "Financial Advisor or Private Wealth Advisor" up to 0.15%, or fifteen basis points as a credit for client deposits into its BDP. In other words, the advisor may make up to fifteen times more than the client on the client's cash balance.

121.    Morgan Stanley charges advisory clients a management fee on the cash balances in sweep accounts. A typical annual advisory fee is approximately one percent (1%) or 100 basis points. In this scenario, Morgan Stanley makes up to 100 times more than the client does on the client's cash balances. Morgan Stanley has established a practice whereby Morgan Stanley and its affiliated banks make significant profits on advisory client cash balances whereas the advisory client, to whom a fiduciary duty is owed, *loses money on his or her cash balances*, because the interest the client earns in his cash sweep account is less than the management fee he or she must pay Morgan Stanley for its "management" and "advisory" services with respect to that portion of the account.

### E.    Morgan Stanley's Violations of Duties, Contractual Obligations, and the Implied Covenant of Good Faith and Fair Dealing

122.    Morgan Stanley breaches its duties, its contractual obligations, and the implied covenant of good faith and fair dealing to and with its clients by creating its BDP for its principal

benefit and automatically enrolling all eligible clients into the Program, over which Morgan Stanley exercises control, all while failing to pay or secure reasonable rates of interest on client cash balances through that offering and placement.

123.    Through its legal and contractual duties, Morgan Stanley was obligated but failed to: (i) set or secure fair and reasonable interest rates on clients' cash balances deposited in Sweep or Program Banks through the BDP that properly took into account "prevailing" or "current" "market conditions" and "competitive interest rates"; and (ii) elevate its clients' interests above its own in creating, implementing, maintaining, and recommending the BDP.

124.    Morgan Stanley's conduct of failing to pay to or secure for its clients a fair or reasonable rate of interest on their cash balances that properly took into account "prevailing" or "current" "market conditions" and "competitive interest rates" unjustly enriches Morgan Stanley at the direct expense of its clients.

125.    Morgan Stanley and its affiliates gained significant financial benefits from the cash balances swept into its BDP through the "spread" the affiliate banks earn on the BDP deposits, the fees Morgan Stanley received from the Sweep and Program Banks, and other incentive arrangements with the affiliate banks that are based, at least in part, on deposit balances and number of accounts in the BDP.

126.    Morgan Stanley's over 200% increase in NII between 2022 and 2024 was a result of Morgan Stanley taking improper advantage of its relationships with its clients, reaping the entire benefit of the rising interest rate environment, while passing none of that benefit on to its clients.

127.    The relationships between Morgan Stanley and its clients, the imbalance of negotiating power between Morgan Stanley and its clients, and Morgan Stanley's exercise of

control over the interest paid in the BDP are circumstances that create an equitable obligation (in addition to any fiduciary or contractual duty) running from Morgan Stanley to its clients.

128.    Morgan Stanley's continual sweep of Plaintiffs' and the Class members' cash into the BDP during the entire period in which they held accounts with Morgan Stanley constitutes a continuing wrong and was a continuing breach of Morgan Stanley's duties to, and contracts with, Plaintiffs and the Class members.  Each time Morgan Stanley placed Plaintiffs' and Class members' cash into the BDP and/or underpaid interest on such cash, Morgan Stanley newly injured Plaintiffs and the Class members.

## F.    Morgan Stanley's Attempted Changes to Its BDP Program Terms Confirm Its Misconduct

129.    In November 2023, Wells Fargo announced that its cash sweep program was under investigation by the SEC. The following month, Morgan Stanley issued an updated BDP Disclosure document that included significant and telling new language concerning conflicts of interest and other issues related to the BDP.

130.    Morgan Stanley's December 2023 changes to the prior BDP disclosure included the following, among others:

- In the section titled "Fee to Morgan Stanley," Morgan Stanley changed language stating that the fee received by Morgan Stanley from the Morgan Stanley Sweep Banks "***may affect***" the interest rate paid on sweep accounts to state that the fee "***affects***" the interest rate.

- Similarly, in the section titled "Conflicts of Interest and Benefits to Morgan Stanley, the Morgan Stanley Sweep Banks and Their Affiliates," Morgan Stanley changed language stating that the Sweep Banks "***may*** receive" "financial benefits in connection with the Program" to state that the Sweep Banks "***expect to*** receive" such benefits.  Morgan Stanley also changed language stating that the Sweep Banks' "income earned through lending and investing "***in ordinary market conditions***" "***may be*** greater"—than the fees Morgan Stanley earned from managing the Sweep Fund, to that such income "***is*** greater" than the fees Morgan Stanley earned from managing the Sweep Fund.

- In that same section, Morgan Stanley also included the following negative facts and attempts to immunize Morgan Stanley from liability, including that:

  o In ordinary market conditions, the BDP provides the Morgan Stanley Sweep Banks with funds at a lower cost than other sources;

  o Morgan Stanley had a "reciprocal deposit" relationship with the unaffiliated BDP banks whereby those banks "provide[d] other deposits to the Morgan Stanley Sweep Banks"—thus "provid[ing] a low-cost source of funding, and capital and liquidity benefits to . . . the Morgan Stanley Sweep Banks";

  o "The Morgan Stanley Sweep Banks have discretion in setting the interest rates paid on deposits received through the Program, and are [purportedly] under no legal or regulatory requirement to maximize those interest rates"; they "can and sometimes do pay higher interest rates on some deposits they receive directly than they pay on deposits received through the Program";

  o "[T]his discretion in setting interest rates creates a conflict of interest for the Morgan Stanley Sweep Banks" because "[t]he lower the amount of interest paid to customers, the greater is the 'spread' earned by the Morgan Stanley Sweep Banks on deposits through the Program"; and

  o In connection with the BDP, the Morgan Stanley Sweep Banks purportedly did not have a fiduciary duty to Morgan Stanley clients, in "contrast" to "money market funds (including Morgan Stanley affiliated money market funds)," which "have a fiduciary duty to seek to maximize their yield to investors, consistent with their disclosed investment and risk-management policies and regulatory constraints."

131.    These belated disclosures publicly acknowledge several conflicts of interest and breaches of duties by Morgan Stanley with respect to its cash sweep program, including those in existence prior to these disclosures, that: (i) Morgan Stanley uses clients' cash in the BDP program to funnel financing to the Sweep Banks at a low cost; (ii) any unaffiliated banks in the sweep program were beholden to Morgan Stanley through a reciprocal quid pro quo of providing financing to one another; and (iii) Morgan Stanley's own Sweep Banks "can and sometimes do" pay higher interest on deposits other than the sweep account deposits, which is in conflict with Morgan Stanley's contractual promise to base its cash sweep interest rates on "current market conditions" and "competitive interest rates."

132.    Morgan Stanley's express inclusion of the above bullet points acknowledges that Morgan Stanley understood that it needed to provide this information to clients, and accordingly, clients did not have such information beforehand.

133.    Morgan Stanley's attempt to proclaim that the Sweep Banks are "under no legal or regulatory requirement to maximize those interest rates" in the BDP program also ignores the contractual obligations that Morgan Stanley itself had to its clients to provide them with a "reasonable rate of interest" and to take into consideration "prevailing" or "current" "market conditions" and "competitive interest rates" when setting those rates.  As a result, Morgan Stanley's attempts to immunize itself from liability through the December 2023 disclosures are ineffectual, and they evince behavior directly contrary to Morgan Stanley's fiduciary, contractual and implied obligations to its clients.

134.    Indeed, any condition, stipulation or provision purporting to waive Morgan Stanley's and/or MSSB's liability for the conduct alleged herein is void as a matter of law.

135.    Plaintiffs also expressly disclaim making any allegations of fraud, or deceptive or misleading conduct.

## CLASS ACTION ALLEGATIONS

136.    Plaintiffs re-allege and incorporate by reference the allegations set forth above. Plaintiffs seek certification of the following Class:

> **Retail clients of Morgan Stanley who had cash deposits or balances in Morgan Stanley's Bank Deposit Program from October 17, 2018, through the end of the conduct alleged herein.**

137.    Plaintiffs also seek certification of the following Sub-Class (the "IRA Subclass"):

> **Retail clients of Morgan Stanley who held a Traditional Individual Retirement Plan, Roth IRA, or SIMPLE IRA account with Morgan Stanley, and had cash deposits or balances**

**in Morgan Stanley's Bank Deposit Program from October 17, 2018, through the end of the conduct alleged herein.**

138.    Plaintiffs reserve the right to amend the Class and Subclass definitions if further investigation and discovery indicates that such definitions should be narrowed, expanded, or otherwise modified.

139.    Excluded from the Class are governmental entities, institutional and other non-retail investors; Morgan Stanley and any of its affiliates, legal representatives, employees, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiffs and the proposed Class and Subclass, including other attorneys and staff at each respective firm.

140.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

**Numerosity**
**Rule 23(a)(1)**

141.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time. However, Morgan Stanley's wealth management program provides financial planning and advisory services to over 6.1 million client accounts through the work of over 16,000 financial advisors.[8]  Accordingly, Plaintiffs and the Class satisfy the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

---

[8] www.morganstanley.com/content/dam/msdotcom/en/wealth-general/nasdaq-private-market/pdf/MorganStanleyWealthManagement_Overview.pdf (accessed April 23, 2024).

**Existence and Predominance of Common Questions of Law and Fact**
**Rule 23(a)(2), 23(b)(3)**

142.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.    whether Morgan Stanley's interest rates paid on its sweep accounts were fair and reasonable and properly accounted for "current market conditions," "prevailing market conditions," and "competitive interest rates";

b.    the existence of Morgan Stanley's fiduciary duties and other duties of care to the Class, and whether Morgan Stanley violated those duties;

c.    whether Morgan Stanley breached the contractual terms of its Disclosure Statements and other written communications to Class members;

d.    whether Morgan Stanley breached the contractual terms of its IRA programs with member of the IRA Subclass;

e.    whether Morgan Stanley breached the implied covenant of good faith and fair dealing;

f.    whether Morgan Stanley was unjustly enriched by its wrongful conduct;

g.    whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

h.    whether and to what extent Class members are entitled to damages and other monetary relief; and

i.    whether and to what extent Class members are entitled to attorneys' fees and costs.

**Typicality**
**Rule 23(a)(3)**

143.    Plaintiffs' claims are typical of the claims of the Class because they were retail account holders with Morgan Stanley that were paid unreasonably low interest rates in their cash sweep accounts that did not take into account "current market conditions," "prevailing market conditions," and "competitive interest rates." Thus, Plaintiffs' claims are typical of the claims of

the Class members as they arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the Class members.

**Adequacy of Representation**
**Rule 23(a)(4)**

144.    Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously.  Plaintiffs have no interests adverse or antagonistic to those of the Class.

**Superiority**
**Rule 23(b)(3)**

145.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

146.    Even if Class members could afford individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

147.    Superiority is particularly satisfied in a circumstance such as this where the law of a single state will apply.  Under the uniform contract terms with Morgan Stanley, the law of New

39

York will apply to each Class member's claims, allowing the Court to adjudicate the claims of all

Class members under a single state analysis.

148.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

### FIRST CLAIM FOR RELIEF
**Breach of Contract**
**Brought on Behalf of Plaintiffs and the Class**
**Against Morgan Stanley Smith Barney LLC**

149.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the paragraphs

above as if fully set forth herein.

150.    MSSB's governing documents related to the BDP constitute a binding agreement

between MSSB and its retail accountholders.

151.    The governing documents provide that MSSB will pay to or secure for its clients a

rate of interest on cash deposits or balances maintained in BDP that properly takes into account

"current market conditions," "prevailing market conditions," and "competitive interest rates."

152.    As set forth herein, MSSB failed to pay to or secure for Plaintiffs and Class

members an interest rate on their BDP holdings that accounted for "current market conditions,"

"prevailing market conditions," and "competitive interest rates"; therefore, MSSB breached the

contracts.

153.    MSSB's past, continuous, and ongoing breach damaged and continues to damage Plaintiffs and the Class.

### SECOND CLAIM FOR RELIEF
**Breach of Contract**
**Brought on Behalf of the IRA Subclass**
**Against Morgan Stanley Smith Barney LLC**

154.    Plaintiffs, on behalf of themselves and the IRA Subclass, hereby re-allege the factual allegations above as if fully set forth herein.

155.    MSSB's governing documents related to its IRAs constitute a binding agreement between MSSB and its IRA accountholders.

156.    The governing documents provide that MSSB will pay to or secure for its clients a "reasonable rate of interest" on cash deposits or balances maintained in the IRAs.

157.    As set forth herein, MSSB failed to pay to or secure for Plaintiffs and the IRA Subclass members a "reasonable rate of interest" on those deposits; therefore, MSSB breached the contracts.

158.    MSSB's past, continuous, and ongoing breach damaged and continues to damage Plaintiffs and the IRA Subclass.

### THIRD CLAIM FOR RELIEF
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**Brought on Behalf of Plaintiffs and the Class**
**Against Morgan Stanley Smith Barney LLC**

159.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

160.    MSSB's governing documents related to its accounts constitute a binding agreement with those accountholders.

161.    Implicit in these contracts (all of which incorporated MSSB's Bank Deposit Program and the BDP Disclosure Statement), and under New York law which governs them, is a covenant of good faith and fair dealing, requiring MSSB to deal fairly with its clients, to fulfill its obligations under the contract in good faith, and to not deprive Class members of the fruits of their bargain.

162.    Through the implied covenant of good faith and fair dealing, MSSB was obligated to pay to or secure for Class members a fair and reasonable rate of interest on their cash balances, and to account for current or prevailing market conditions and competitive interest rates.  By failing to do so, MSSB breached the implied covenant of good faith and fair dealing.

163.    MSSB's past, continuous, and ongoing breach of the implied covenant damaged and continues to damage Plaintiffs and the Class.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**Breach of Fiduciary Duty**
**Brought on Behalf of Plaintiffs and the Class Against All Defendants**

164.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein.

165.    MSSB owed fiduciary duties to Plaintiffs and Class members with respect to the Bank Deposit Program.

166.    These duties include, but are not limited to:

    a.    a duty of care;

    b.    a duty of loyalty;

    c.    a duty to act in the best interests of its clients; and

    d.    a duty not to place Morgan Stanley's interests above those of its clients.

167.    MSSB breached the foregoing duties when it (i) failed to pay to or secure for Plaintiffs and the Class a fair or reasonable rate of interest on their free credit balances that properly took into account "current market conditions," "prevailing market conditions," and "competitive interest rates"; (ii) failed to act in the best interests of Plaintiffs and the Class vis-à-vis the cash sweep program, (iii) recommended to Plaintiffs and the Class that they utilize and continue to utilize the Bank Deposit Program; and (iv) added to client disclosure documents assertions that MSSB was not responsible or liable for a failure to abide by its duties to its clients.

168.    MSSB's past, continuous, and ongoing breach of duties damaged Plaintiffs and the Class.

169.    Defendant Morgan Stanley knowingly encouraged, directed, and participated in the breaches of fiduciary duty by MSSB.

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment
### Brought on Behalf of Plaintiffs and the Class Against All Defendants

170.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim in the alternative to the preceding Claims.

171.    As a result of Morgan Stanley's wrongful conduct, Plaintiffs and the Class received unfair and unreasonably low interest payments on their cash sweep deposits.

172.    As a result of Morgan Stanley's wrongful conduct, Morgan Stanley was unjustly enriched because it received significantly and increasingly greater Net Interest Income than it would have but for its wrongful conduct.

173.    Morgan Stanley appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class.

174.    It would be inequitable and unjust for Morgan Stanley to retain these wrongfully obtained profits.

175.    Morgan Stanley's retention of this wrongfully-obtained net interest income would violate the fundamental principles of justice, equity, and good conscience.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class (including the IRA Subclass), demand judgment and relief as follows:

      a.     certifying the proposed Class and IRA Subclass, and appointing Plaintiffs and their counsel to represent the proposed Class;

      b.     awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

      c.     awarding Plaintiffs and Class members restitution, disgorgement of profits, and forfeiture of compensation;

      d.     awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

      e.     awarding such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class (including the IRA Subclass), demand a trial by jury on all issues so triable.

DATED: October 10, 2024          Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

*/s/ Matthew L. Dameron*
Matthew L. Dameron (NY Bar No. 5081773)
Clinton J. Mann
1100 Main Street, Suite 2600
Kansas City, MO 64105
Telephone: (816) 945-7110
matt@williamsdirks.com
cmann@williamsdirks.com

Thomas I. Sheridan, III
Sona R. Shah
**SIMMONS HANLY CONROY LLP**
112 Madison Avenue
New York, NY 10016
Telephone: (212) 784-6404
tsheridan@simmonsfirm.com
sshah@simmonsfirm.com

Bruce D. Oakes
Richard B. Fosher
**OAKES & FOSHER, LLC**
1401 Brentwood Boulevard, Suite 250
Saint Louis, MO 63144
Telephone: (314) 804-1412
boakes@oakesfosher.com
rfosher@oakesfosher.com

Salvatore J. Graziano
John Rizio-Hamilton
Avi Josefson
Adam Wierzbowski
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
salvatore@blbglaw.com
johnr@blbglaw.com
avi@blbglaw.com
adam@blbglaw.com

Robert J. Jackson, Jr.
**BUZIN LAW, P.C.**
3003 Purchase Street
P.O. Box 529
Purchase, NY 10577
Tel: (212) 879-8100
robert.j.jackson@nyu.edu

Michael Dell'Angelo (*pro hac vice* forthcoming)
Alex B. Heller (*pro hac vice* forthcoming)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000

mdellangelo@bm.net
aheller@bm.net
rraghavan@bm.net

Alan L. Rosca (*pro hac vice* forthcoming)
Jonathan A. Korte (*pro hac vice* forthcoming)
**ROSCA SCARLATO LLC**
2000 Auburn Drive, Suite 200
Beachwood, OH 44122
Telephone: (216) 946-7070
arosca@rscounsel.law
jkorte@rscounsel.law

Paul J. Scarlato (*pro hac vice* forthcoming)
**ROSCA SCARLATO LLC**
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: (216) 946-7070
pscarlato@rscounsel.law

***Counsel for Plaintiffs and the Proposed Class and IRA Subclass***