USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 09/08/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

SUSANNE SHERLIP MEHLMAN AND JOY SABRINA HULTMAN, AS EXECUTORS OF THE ESTATE OF BERNARD J. SHERLIP, MICHAEL J. BARRETT, AS TRUSTEE OF THE BARRETT LIVING TRUST, and ANDREW DAVITT, on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

MORGAN STANLEY, MORGAN STANLEY & CO. LLC, and MORGAN STANLEY SMITH BARNEY LLC,

Defendants.

------------------------------------------------------------ X

24-CV-4571 (VEC)

OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

This is another of the many cases in which customers are suing their brokerage firms for paying unreasonably low interest rates on cash swept to affiliated banks. In this version, Plaintiffs Susanne Sherlip Mehlman and Joy Sabrina Hultman, as Executors of the Estate of Bernard J. Sherlip ("Sherlip Estate"), Michael J. Barrett, as Trustee of the Barrett Living Trust ("Barrett Trust"), and Andrew Davitt are suing on behalf of a putative class Morgan Stanley Smith Barney LLC ("MSSB") and its corporate parent for the interest rates paid in MSSB's cash sweep program. Plaintiffs' allegations boil down to the simple argument that MSSB was obligated to pay a reasonable or competitive rate of interest on Plaintiffs' swept cash but did not do so. *See generally* Second Am. Consol. Class Action Compl. ("SACCAC"), Dkt. 86. Plaintiffs assert claims for breach of contract, breach of the implied covenant, breach of fiduciary

duty, and unjust enrichment on behalf of themselves and three putative classes. Defendants move to dismiss the Complaint in its entirety. *See* Mot. to Dismiss (the "Motion" or "Mot."), Dkt. 91. For the following reasons, Defendants' Motion is GRANTED in part and DENIED in part.

## BACKGROUND[1]

### I. The Bank Deposit Program and Relevant Contracts

MSSB is a wholly owned subsidiary of Morgan Stanley that provides wealth management services to clients, including Plaintiffs and members of the proposed class. SACCAC ¶ 17–18. Plaintiffs are individual accountholders with MSSB. *Id.* ¶¶ 13–15. The Sherlip Estate maintained multiple accounts with MSSB, including investor brokerage accounts, advisory accounts, and an Individual Retirement Account ("IRA"). *Id.* ¶¶ 13, 29. Similarly, the Barrett Trust maintained an advisory account with MSSB, *id.* ¶ 14, and Mr. Davitt maintained an advisory account, an IRA, and a Roth IRA, *id.* ¶ 15.

As part of the account opening process, all Plaintiffs and putative class members executed an MSSB Client Agreement ("Client Agreement"), which authorized the cash sweep program. *Id.* ¶¶ 26–27.[2] Specifically, the Client Agreement states:

> You acknowledge and agree that, if your account is eligible, we are authorized without further direction from you to automatically deposit or "sweep" all free credit balances in your account(s) into one or more FDIC insured depository institutions affiliated with us ("Sweep Banks") up to the Deposit Maximum, as defined in the Bank Deposit Disclosure Statement, across the Sweep Banks and then into the applicable money market mutual fund, as set forth in more detail in the Bank Deposit Program Disclosure Statement . . . a copy of which will be sent to you upon your first deposit in the Bank Deposit Program ("BDP"), and by which you agree to be bound.

---

[1] For purposes of deciding this Motion, the Court assumes the truth of the well-pled factual allegations in the Second Amended Consolidated Class Action Complaint. *See Hu v. City of N.Y.*, 927 F.3d 81, 88 (2d Cir. 2019).

[2] As the Parties agree, the various documents appended to the declarations referenced herein are considered "integral" to the SACCAC and accordingly are appropriate to consider in deciding this Motion without converting it into one for summary judgment. *See Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005).

*Id.* ¶ 28; Weinstein Declaration, Dkt. 93 ("Weinstein Decl."), Ex. 5 at 14. Other agreements governing, for example, IRA, Roth IRA, and advisory accountholder relationships separately incorporate cash sweeps and the BDP. *See* SACCAC ¶¶ 29–33; Weinstein Decl. Ex. 7 at 7 (retirement accounts); Dameron Declaration, Dkt. 95 ("Dameron Decl."), Ex. 2 at 11–12 (advisory accounts).

MSSB's BDP authorizes the transfer of uninvested cash in a client's account to a sweep account at a partner bank at which the cash generates interest. SACCAC ¶¶ 38–42; *see generally* Weinstein Decl. Ex. 2 (BDP disclosures). The partner banks, Morgan Stanley Bank and Morgan Stanley Private Bank, are corporate affiliates of MSSB. SACCAC ¶ 39. As the cash generates interest, MSSB retains a certain amount of said interest as profit and pays the rest at a rate determined by MSSB to accountholders. *See id.* ¶¶ 36–38; Weinstein Decl. Ex. 2 at 8–9. The BDP authorizes MSSB to act as an agent to deposit and withdraw the swept funds from the sweep accounts as appropriate when a client has idle cash or to satisfy a debit for any reason. *See* Weinstein Decl. Ex. 2 at 5–6. In other words, while idle cash is, by default, swept pursuant to the BDP, clients can choose to invest or remove those funds at any time, which would result in a withdrawal of their cash from the sweep accounts. *See id.*

As noted above, the BDP disclosure advises that accountholders will earn interest on swept cash. *See id.* at 6. Specifically, MSSB's BDP disclosure states that swept cash earns interest at a rate that "is generally based on a variety of factors, including, but not limited to, current market conditions and competitive rates." *Id.*; *see also* SACCAC ¶ 51. At the same time, the disclosure asserts that MSSB and its partner banks "reserve the right to change the interest rates without prior notice to [accountholders] or the methodology used to determine the interest rates on Deposit Accounts in their sole discretion." Weinstein Decl. Ex. 2 at 6;

SACCAC ¶ 52. The disclosure also advises MSSB accountholders that "[t]he interest rates paid with respect to the Deposit Accounts at the Sweep Banks may be higher or lower than the interest rates available on other deposit accounts offered by a Sweep Bank or on deposit accounts offered by other depository institutions." Weinstein Decl. Ex. 2 at 6.

Separate but relatedly, MSSB's agreement with retirement accountholders authorizes MSSB to sweep uninvested cash into accounts at its affiliate banks and notes that those accounts will earn "a reasonable rate of interest." Weinstein Decl. Ex. 7 at 7; SACCAC ¶ 87.

Arising out of and intertwined with these contracts are alleged fiduciary duties owed by Defendants to Plaintiffs and the putative class. As to advisory accountholders, this duty is explicit under the relevant agreement. *See* Dameron Decl. Ex. 2 at 3 ("When we act as your advisor, we are a fiduciary to you under applicable law"); *see also* SACCAC ¶ 98. Defendants allegedly also assumed agency duties with respect to the BDP. *See* Weinstein Decl. Ex. 2 at 10 ("[W]e are acting as your agent and custodian in establishing the Deposit Accounts at each Sweep Bank and depositing funds into, withdrawing funds from and transferring funds among the Deposit Accounts at each Sweep Bank and among Sweep Banks"); *see also* SACCAC ¶ 74–76.

Plaintiffs allege that these facts together give rise to various duties on the part of Defendants, including duties of care and loyalty, and the duty of Defendants to act in the best interests of their clients. *See, e.g.*, SACCAC ¶ 196. These duties allegedly apply to all Plaintiffs and putative class members, regardless of whether they held funds in an advisory account. *See id.* ¶¶ 194–207.

## II. The Interest Rate Landscape

Plaintiffs allege that, during the putative class period, the interest rates paid by MSSB to accountholders participating in the BDP were unreasonably low based on several comparators.

First, Plaintiffs point to the federal funds rate, which, during the class period, experienced its largest increase in decades, leading to a peak interest rate of 5.33% in August 2024. SACCAC ¶¶ 57–58; 138–40. Second, Plaintiffs point to the yield on U.S. Treasury Bills, specifically the one-month Treasury Bill, which reached a peak rate of approximately 6% during the class period. *Id.* ¶¶ 142–44. Third, Plaintiffs allege that other banks that have programs similar to the BDP, including those that sweep to unaffiliated partner banks, paid higher rates to their accountholders, ranging from about 2% to 5%. *Id.* ¶¶ 126–36. Finally, Plaintiffs allege that the interest rates paid on short-term instruments, such as repurchase agreements, ranged from about 4.83% to 5.55% during the class period. *Id.* ¶¶ 145–47. In comparison, MSSB paid the putative class between 0.01% to 0.50% interest on most cash balances, except for a rate increase in August 2024 of up to 2% interest on swept cash for advisory account clients with balances in excess of $250,000. *Id.* ¶¶ 62, 80, 132.

## III. Procedural History

Plaintiffs filed their original complaint on June 14, 2024, *see* Dkt. 1; Defendants promptly moved to dismiss the complaint, *see* Dkt. 32. Plaintiffs responded by filing an amended complaint. *See* Dkt. 40. This matter was then consolidated into its present form, *see* Dkt. 57, and the operative Second Amended Consolidated Class Action Complaint was filed on August 18, 2025, *see* Dkt. 86. Defendants moved to dismiss the SACCAC shortly thereafter. *See* Dkt. 91.

# DISCUSSION

To survive a motion to dismiss for failure to state a claim, "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com*, Inc., 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). "[A] complaint does not need to contain detailed or elaborate factual allegations, but

only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citations omitted). The Court accepts Plaintiffs' well-pled factual allegations as true, *Twombly*, 550 U.S. at 555, and "draw[s] all reasonable inferences in the plaintiff's favor." *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). The Court, however, is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

Before addressing Defendants' Motion claim-by-claim, the Court turns to three threshold issues: the statute of limitations, release, and claims brought against the corporate parent, Defendant Morgan Stanley.

## I. Plaintiffs' Claims Are Not Time-Barred

Defendants argue that Plaintiffs' claims are all time-barred under New York's statute of limitations. *See* Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def. Mem."), Dkt. 92 at 17. The Parties agree that New York's statute of limitations for the claims at issue is six years. *See id.*[3]; *see also* Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss ("Opp. Mem."), Dkt. 96 at 15. Defendants, however, claim that because the rates provided by the BDP were already significantly lower in 2017 than the comparators cited by Plaintiffs in their complaint, *see* SACCAC ¶¶ 127, 139, 143, 147, Plaintiffs' claims should be tolled from at least that point, if not earlier based either on when the BDP was established or when Plaintiffs opened their respective accounts. *See* Def. Mem. at 17–18. The Court disagrees.

[3] Defendants argue that the Parties' contracts are governed by New York law except as to the issue of the statute of limitations. *See* Def. Mem. at 17 n.4. The Court agrees that for the purposes of the Motion, it is not necessary to determine whether New York's borrowing statute applies to Plaintiffs' claims. The following analysis, however, likely means that Plaintiffs' claims are not time-barred under any jurisdiction's statute of limitations.

First, as Plaintiffs rightfully note, the proposed class period is October 17, 2018, through the end of the conduct alleged in the SACCAC, and Plaintiffs do not seek recovery for prior harm. Opp. Mem. at 14–15. While Plaintiffs have alleged certain facts that arose outside of the six-year limitations period, *see, e.g.*, SACCAC ¶¶ 45–49, such facts are not necessary to sustain Plaintiffs' claims, and Plaintiffs expressly limit their requested recovery to harms that would fall within New York's statute of limitations. *See* Opp. Mem. at 14–15.

Second, New York law recognizes the continuing-violation doctrine; that doctrine states that "where a contract provides for continuing performance over a period of time, each breach may begin the running of the statute anew such that accrual occurs continuously." *Miller v. Metropolitan Life Ins. Co.*, 979 F.3d 118, 122 (2d Cir. 2020). Defendants argue that the doctrine does not apply here because the only harms alleged by Plaintiffs consist of the "effects of a preexisting wrong." *See* Defendants' Reply Memorandum in Support of Motion to Dismiss ("Reply Mem."), Dkt. 99 at 10 (citing cases). Here, however, Plaintiffs allege that each time Defendants swept their cash into the BDP and each time Defendants underpaid interest on that swept cash (acts that occurred continuously throughout the putative class period), such action constituted a new injury to the class. *See* SACCAC ¶ 157.

The Court agrees. Because each alleged underpayment of interest constituted a new breach of the Parties' agreements, Plaintiffs have alleged "continuing unlawful acts" as required to avail themselves of the doctrine. *Miller*, 979 F.3d at 122. Accordingly, the statute of limitations was effectively recommenced with each new breach, bringing the claims well within New York's six-year limitations period. *See Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 802 F. Supp. 3d 701, 711–12 (S.D.N.Y. 2025) (holding same).

## II. Plaintiffs Did Not Release Their Claims

Defendants' second threshold argument is that Plaintiffs waived their claims. This, however, is more accurately restated as an argument that Plaintiffs released the specific claims raised in the Complaint. In support, Defendants point to two contractual provisions: (1) the provision in the BDP Disclosure Statement that grants Defendants "sole discretion" to determine BDP rates; and (2) the Client Agreement that provides that all clients "acknowledge and agree that the rate of return on the Bank Deposit Program may be higher or lower than the rate of return available" on "other available sweep investments" or "other available cash alternatives," and provides that MSSB "is not responsible" to customers in that event. *See* Def. Mem. at 19; *see also, e.g.*, Weinstein Decl. Ex. 2 at 6; *id.* Ex. 5 at 14. Plaintiffs argue that these provisions either do not apply, or that Defendants have failed to show that Plaintiffs knowingly and intelligently waived the claims stated in their complaint. Opp. Mem. at 17–18.

"[T]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000). "A contract is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *CreditSights, Inc. v. Ciasullo*, No. 05-CV-9345, 2008 WL 4185737, at *8 (S.D.N.Y. Sep. 5, 2008) (citation modified). Because releases are interpreted according to standard contract principles, a claim must be dismissed if it is clearly and unambiguously barred by the terms of a release. *See Dozier v. Deutsche Bank Trust Co. Americas*, No. 09-CV-9865, 2011 WL 4058100, at *3 (S.D.N.Y. Sep. 1, 2011) (citing cases). If the terms of a purported release are ambiguous, such ambiguities are resolved against the drafter. *See In re JPMorgan Chase Cash Sweep Program*, No. 24-CV-6404, 2026 WL 396055, at *5

(S.D.N.Y. Feb. 12, 2026) (citing *Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

The provisions cited by Defendants do not clearly and unambiguously release these claims. Construing the provisions in Plaintiffs' favor, the BDP's conferral of "sole discretion" in setting the interest rates to Defendants does not unambiguously release them from the various claims brought in this action. *See* Weinstein Decl. Ex. 2 at 6. The grant of sole discretion to Defendants to set the rate of interest clearly states neither the type of claim that is supposedly being released nor the fact that Plaintiffs were releasing a legal right to sue.

Similar reasoning applies to the second provision, though it is more favorable to Defendants. The provision stating that Defendants are "not responsible" if interest rates in the BDP are lower than other alternatives could be read as Plaintiffs' agreement to release any claims regarding the rate of interest paid on their swept cash. The Court, however, finds it separately reasonable that Plaintiffs, or an average consumer reading the relevant agreement, could read this provision as a mere acceptance of a declaration of risk as opposed to a wide-ranging release of claims. *Id.* Ex. 5 at 14.

Indeed, Defendants' purported release falls below the specificity of other releases that have been scrutinized in the caselaw. *Compare id.* (provision stating that MSSB is "not responsible" if BDP rates are higher or lower than other investment instruments or similar programs) *with, e.g.*, *Info. Superhighway, Inc. v. Talk Am., Inc.*, 274 F. Supp. 2d 466, 470–71 (S.D.N.Y. 2003) (finding ambiguous an agreement that released "all claims, obligations and demands that have been asserted or could have been asserted" regarding a specific set of trademarks). Put simply, the second purported release is ambiguous, and, at the motion to dismiss stage, the Court is required to resolve this ambiguity against the Defendants because the release "do[es] not clearly and unambiguously cover Plaintiffs' claims." *In re JPMorgan Chase*

*Cash Sweep Program*, 2026 WL 396055, at *5; *see also Info. Superhighway, Inc.*, 274 F. Supp. 2d at 471 ("Given [] two plausible meanings, the release is ambiguous … [and] cannot be resolved on a motion to dismiss.") (citation modified). The Court will, accordingly, not dismiss the claims on the grounds of release.

## III. Defendant Morgan Stanley is Dismissed from this Action

Plaintiffs bring claims against both MSSB and its corporate parent, Morgan Stanley. Specifically, Plaintiffs bring claims for breach of fiduciary duty and unjust enrichment against the corporate parent. *See* SACCAC ¶¶ 194–213. Defendants argue that Morgan Stanley is not a proper defendant in this action because Plaintiffs have no relationship with the corporate parent. *See* Def. Mem. at 42; Reply Mem. at 27. Plaintiffs counter that Morgan Stanley can be held liable for these claims under either an agency, veil piercing, or alter ego theory of liability. Opp. Mem. at 43–44.[4] The Court disagrees.

### A. Veil Piercing or Alter Ego Theory

"New York's veil-piercing test and the alter ego theory are indistinguishable, do not lead to different results, and should be treated as interchangeable." *John Wiley & Sons, Inc. v. Nice Global LLC*, No. 25-CV-2662, 2026 WL 880403, at *4 n.4 (S.D.N.Y. Mar. 31, 2026) (citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991)) (citation modified). To establish a plausible theory of veil piercing at the motion to dismiss stage, a plaintiff must make factual allegations sufficient to give rise to an inference "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; *and* (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Thrift Drug, Inc. v. Univ. Prescription Adm'rs*, 131

[4] Interestingly, although Plaintiffs advance these theories of corporate parent liability, they do not bring any of their contract claims against Morgan Stanley.

F.3d 95, 97 (2d Cir. 1997) (citation omitted) (emphasis in original). Generally, "New York law disfavors disregard of the corporate form." *Sutton 58 Assocs. LLC v. Pilevsky*, 189 A.D.3d 726, 729 (1st Dep't 2020).

Plaintiffs' allegations fail to establish a plausible inference that Morgan Stanley can be held liable under a veil piercing theory. As Plaintiffs themselves state, their allegations as to Morgan Stanley's role in the claims at issue consist of: (1) Morgan Stanley's SEC filings that define "Morgan Stanley" to include its subsidiaries, *see* SACCAC ¶ 20 n.1; (2) Morgan Stanley's discussion of and participation in the alleged SEC investigation into MSSB's BDP, *id.* ¶¶ 61–62; and (3) MSSB's use of Morgan Stanley trademarks in its contracts, *see generally* Weinstein Decl. Exs. 2–3, 5–6. Any other allegations relating to Morgan Stanley's participation in the transactions at issue are conclusory and insufficient to defeat a motion to dismiss.[5]

These allegations do not allow the Court plausibly to infer that Morgan Stanley exercised "complete domination" over MSSB with respect to the BDP. Indeed, these allegations give rise to little more than the inference that Morgan Stanley was aware of the cash sweep program and may have assisted in regulator inquiries relating to the same. *Cf. Liberty Cap. Grp.*, 802 F. Supp. 3d at 710–11 (allegations relating to shared leadership structure and general central control over cash sweep program insufficient); *In re Wells Fargo Cash Sweep Litig.*, No. 24-CV-4616, 2025 WL 1785315, at *4 (N.D. Cal. June 27, 2025) (dismissing corporate parent in cash sweep litigation with similar allegations); *In re JPMorgan Chase Cash Sweep Program*, 2026 WL

[5] *See, e.g.*, SACCAC ¶ 19 (stating in conclusory fashion that Morgan Stanley "dicat[es] the policies, procedures, and practices of MSSB with respect to the specific activities upon which the claims herein are based"); *id.* ¶ 210 (stating legal conclusion that Morgan Stanley was "unjustly enriched.").

396055, at *3–5 (same). In short, Plaintiffs fail plausibly to allege a veil piercing or "alter ego" theory of liability.

**B. Agency Theory**

Nor do Plaintiffs plausibly allege that Morgan Stanley can be held liable under an agency theory. "Under an agency theory, the claim against the parent is premised on the view that the subsidiary had authority to act, and was in fact acting, on the parent's behalf – that is, in the name of the parent." *In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055, at *5 (citation modified). Plaintiffs cite no factual allegations in the SACCAC, nor can the Court identify any, that support an agency theory apart from those discussed above with respect to piercing the corporate veil. For similar reasons discussed there, those allegations fail to support an agency theory of liability because they do not give rise to a plausible inference that MSSB was acting on behalf of Morgan Stanley.

Plaintiffs' reliance on *Mehlman v. Ameriprise Fin., Inc.*, No. 24-CV-3018, 2025 WL 2403252, at *7 (D. Minn. Aug. 19, 2025), is not helpful. First, that case was decided under Minnesota, rather than New York, law. Second, and more important, the facts that supported the finding of corporate parent liability there went to a *respondeat superior*, rather than agency, theory of liability; that is not a permitted theory under New York law. *See Abdelhamid v. Altria Grp., Inc.*, 515 F. Supp. 2d 384, 394 (S.D.N.Y. 2007) ("[T]he common law doctrine of

respondeat superior . . . does not render a parent company liable for the conduct of a subsidiary.”).

In short, Plaintiffs have failed to plead facts that allow the Court plausibly to infer that Plaintiffs have a claim against MSSB’s corporate parent. Accordingly, the Complaint is dismissed as against Morgan Stanley.

## IV. Defendants’ Motion to Dismiss is Otherwise Granted in Part and Denied in Part

### A. Plaintiffs State a Claim for Breach of Contract on Behalf of all Class Members

Count One alleges breach of contract. Under settled New York law, “a claim for breach of contract lies where a plaintiff alleges (1) the existence of a contract; (2) plaintiff’s performance under the contract; (3) defendant’s breach of the contract; and (4) damages.” *Liberty Cap. Grp.*, 802 F. Supp. at 712–13. As to the breach of contract claim in Count One, the Parties do not dispute that the first two elements are adequately alleged. Accordingly, the Court will limit its discussion to the latter two.

Plaintiffs’ first breach of contract claim can be summarized succinctly: under the terms of the BDP, MSSB promised to pay an interest rate that was “generally based on a variety of factors including, but not limited to, current market conditions and competitive interest rates,” SACCAC ¶ 51; Weinstein Decl. Ex. 2 at 6; MSSB paid a low and generally flat interest rate throughout the putative class period, *see* SACCAC ¶¶ 62, 80, 132; rates that were indicative of current market conditions or competitive interest rates were both varied and much higher throughout the same period, *see id.* ¶¶ 57–58; 138–40 (Federal Funds Rate); ¶¶ 142–44 (U.S. Treasury Bills); ¶¶ 126–36 (other brokerages); ¶¶ 145–47 (repurchase agreements); thus, the BDP’s low interest rates could not have been based on “current market conditions and competitive interest rates,” *see id.* ¶ 182.

First, MSSB argues that Plaintiffs fail to state a claim because MSSB "complied with the express terms of the BDP agreements": MSSB set the rates, notified Plaintiffs of the rates, and paid the rates MSSB set. Def. Mem. at 21. This argument is obtuse. Plaintiffs are not challenging the delivery of their interest payments; they are challenging how MSSB set the interest rates vis-à-vis its contractual obligations.

MSSB's second argument gets to the heart of the matter. In sum, MSSB argues that the statement that rates are "generally" based on a variety of factors, "including, but not limited to, current market conditions and competitive rates" is so vague that it cannot support a breach of contract claim. *Id.* at 22. At the motion to dismiss stage, this argument fails for a number of reasons. First, Plaintiffs are not required to allege specific facts that demonstrate that MSSB did not actually consider current market conditions and competitive interest rates when setting BDP interest rates. Plaintiffs are only required to allege facts that give rise to a plausible inference that MSSB did not, in fact, consider current market conditions and competitive interest rates when setting the rates. *See Ashcroft*, 556 U.S. at 678. Here, Plaintiffs allege various facts pertaining to interest rates generally in addition to interest rates paid by competitor banks, all of which were significantly higher and more variable than the BDP's interest rates. Having done so, the Court can draw a reasonable inference that MSSB did not, in fact, consider the factors it contractually undertook to consider when setting the BDP interest rates. *See Goldsmith v. UBS Fin. Servs. Inc.*, No. 24-CV-6354, 2026 WL 819461, at *14 (S.D.N.Y. Mar. 25, 2026) (same conclusion based on similar allegations in cash sweeps context); *Gehring v. Osaic Inc.*, No. 25-CV-00367, 2026 WL 248379, at *7–8 (D. Ariz. Jan. 30, 2026) (applying New York law and

reaching same conclusion); *In re Wells Fargo Cash Sweep Litig.*, 2025 WL 1785315, at *2 (same). That is enough to get this claim past a motion to dismiss.[6]

Nor is Plaintiff's claim defeated by MSSB's claimed sole and unlimited discretion in setting BDP rates. *See* Def. Mem. at 23. "A viable contract claim exists when a contract provides for discretion, but the defendant allegedly exceeded the contractual bounds of that discretion." *In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055, at *7; *see also Goldsmith*, 2026 WL 819461, at *13. Although MSSB contractually appears to have given itself unbounded discretion in setting rates, it nonetheless committed itself to basing rates on "current market conditions and competitive interest rates," among other factors. Weinstein Decl. Ex. 2 at 6. That statement is, in fact, a limit on MSSB's discretion, despite other language elsewhere in the contract. That is to say, MSSB did have discretion to set and change interest rates at any given time, but it was contractually obligated to consider current market conditions and competitive interest rates each time it did so. The extent of the consideration that needed to be given to these factors remains to be seen. *See supra* note 6.

Finally, the Court addresses MSSB's causation argument briefly. In short, MSSB argues that because Plaintiffs were aware of the interest rates they were receiving and could have walked away from the transaction at any time, their harm was not proximately caused by MSSB. *See* Def. Mem. at 28–29. This argument sounds in mitigation of damages, an affirmative defense, as opposed to causation. *See U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 440–41 (S.D.N.Y. 2010) ("In a breach of contract action, a plaintiff ordinarily has a duty to mitigate the damages that he incurs. If the plaintiff fails to mitigate his damages, the

---

[6] The Court notes, of course, that Plaintiffs' hurdle will be much higher at the summary judgment stage. By then, Plaintiffs will need to show what MSSB actually considered in setting interest rates. While Defendants do not have unlimited discretion, this contract is incredibly favorable to MSSB. To the extent the evidence shows that market conditions and competitive interest rates were considered, even if they were largely discounted, Plaintiffs will have a difficult row to hoe to survive summary judgment on this claim.

defendant cannot be charged with them"); *accord Schmidlin v. Raymond James Fin., Inc.*, 24-CV-2041, 2026 WL 847197, at *7 (M.D. Fla. Mar. 27, 2026) (finding same in response to similar argument in cash sweeps litigation). The Court declines to consider this argument at the motion to dismiss stage.

For all of these reasons, MSSB's motion to dismiss Count One is denied.

### B. Plaintiffs State a Claim for Breach of Contract on Behalf of the Proposed IRA Subclass

Count Two alleges breach of contract on behalf of the IRA subclass based on an alleged breach of the "reasonable rate" obligation. Plaintiffs allege that the interest rate paid to the IRA subclass was significantly lower than the average rates paid by banks across the United States. *See, e.g.*, SACCAC ¶¶ 128–36. A finder of fact could determine that given the gulf between what MSSB paid and what other banks paid on similar deposits that the rate MSSB paid was not reasonable. *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 19-CV-7998, 2021 WL 240737, at *1 (S.D.N.Y. Jan. 25, 2021). This claim is adequately alleged.

The Court thinks it worthwhile to address several arguments MSSB has made specific to the reasonable rate provision. First, MSSB argues that the reasonable rate provision in its contract is different than in *Valelly* because, in this case, the provision is only an authorization as opposed to a promise.[7] *See* Def. Mem. at 25–26. This is a distinction without a difference. While it is true that MSSB does not directly promise in the contract to pay a reasonable rate of interest, the contract authorizes MSSB to deposit clients' cash balances only in accounts that bear a reasonable rate of interest. Said differently, if MSSB chooses to act on its clients'

[7] The contract states that IRA account holders "authorize the deposit or investment of cash balances in the Account in . . . deposit accounts . . . that bear a reasonable rate of interest." Weinstein Decl. Ex. 7 at 7.

authorization to sweep their funds, it must do so into accounts that bear a reasonable rate of interest. While this may be an indirect promise of sorts, a promise it nonetheless is.

Second, MSSB makes much of the fact that this reasonable rate provision is found in Internal Revenue Code ("IRC") mandated disclosures and that the relevant IRC statute does not create a private right of action. Courts in nearly identical cases have repeatedly rejected this argument, and this Court agrees with that reasoning. *See Goldsmith*, 2026 WL 819461, at *15 (defendant "fails to explain why a promise is unenforceable simply because it is contained in a document that [it] is required to issue by regulation"); *In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055, at *7 (same); *In re Walls Fargo Cash Sweep Litig.*, 2025 WL 1785315, at *2 (same). It is of no moment that this section of the IRC provides no private right of action. Plaintiffs are not bringing a claim pursuant to the IRC; they are bringing a breach of contract claim based on the reasonable rate provision.

Third, and finally, the Court rejects MSSB's argument that Plaintiffs' "acceptance" of their interest rate demonstrates reasonableness as a matter of law. As discussed *supra*, this argument sounds in mitigation of damages and is inappropriate to consider at the motion to dismiss stage. For all those reasons, MSSB's motion to dismiss Count Two is denied.

**C. Plaintiffs' Comparators Will Not Be Stricken**

As the Court has denied the Motion with respect to the breach of contract claims, it now considers Defendants' request to strike Plaintiffs' "comparators" under Rule 12(f). In particular, Defendants ask the Court to strike all allegations comparing BDP rates to the Federal Funds Rate, SACCAC ¶¶ 137–41, short-term U.S. Treasury Bills, *id.* ¶¶ 142–44, and repurchase agreements, *id.* ¶¶ 145–47. This is premised on the belief that such comparisons are inherently flawed because these rates are fundamentally different from a cash sweep program. Def. Mem. at 29.

"Motions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Slue v. N.Y. Univ. Med. Ctr.*, 409 F. Supp. 2d 349, 374 (S.D.N.Y. 2006). The key question is whether the challenged allegations "plausibly support" the claims brought in the complaint. *Goldsmith*, 2026 WL 819461, at *14.

Defendants, relying heavily on this Court's past decisions in *Valelly*, argue that the comparators cited by Plaintiffs in their Complaint should be struck because they are akin to the distinct investment vehicles which this Court refused to consider in that case. *See* Def. Mem. at 29–30 (citing *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634 (S.D.N.Y. 2020); *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 19-CV-7998, 2021 WL 240737 (S.D.N.Y. Jan. 25, 2021); *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 19-CV-7998, 2023 WL 4239073 (S.D.N.Y. June 28, 2023)). Defendants stretch *Valelly*, which involved different contractual allegations, too far.

In *Valelly*, the Court determined that it was inappropriate to allow the plaintiff to substantiate its claim that Merrill Lynch failed to pay a reasonable rate of interest on her swept cash by making comparisons to distinct investment vehicles such as money market mutual funds. 464 F. Supp. 3d at 644–45. That decision reflected, in part, the fact that plaintiff's claim in that matter was for a failure to pay a "reasonable rate" of interest. Accordingly, as this Court reasoned, it was inappropriate to make a determination as to whether the interest plaintiff received on her deposit account was "reasonable" by drawing comparisons to other investment options that had features that are different from a bank deposit account.

Here, by contrast, Plaintiffs' claims are premised not only on the argument that Plaintiffs were owed a reasonable rate of interest on their BDP funds, but that they were entitled to a rate of interest that was set by considering "current market conditions and competitive interest rates." *E.g.*, SACCAC ¶ 51. Accordingly, the comparators discussed in the complaint "need not be

perfect comparators . . . to support Plaintiffs' claims . . . [but] need only" plausibly refer to the "current market conditions" that Defendants promised to consider when setting rates. *Goldsmith*, 2026 WL 819461, at *14. Further, at the motion to dismiss stage, allegations relating to these comparators plausibly support Plaintiffs' claims that MSSB did not "base its sweep account interest rates on competitive rates." SACCAC ¶ 125; *see also Wood v. Prudential Ret. Ins.*, No. 15-CV-1785, 2016 WL 5940946, at *4 (D. Conn. Sep. 19, 2016) (inappropriate at motion to dismiss stage to determine whether similar market benchmarks were among the factors defendant was obligated to consider in setting interest rates because such determination is fact specific). These allegations will thus not be stricken because they support Count One of the SACCAC.

### D. Plaintiffs State a Claim for Breach of the Implied Covenant

Count Three alleges breach of the implied covenant of good faith and fair dealing. To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff "must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Dweck Law Firm, L.L.P. v. Mann*, 340 F. Supp. 2d 353, 358 (S.D.N.Y. 2004). This claim, however, "is merely a breach of the underlying contract" and "New York law . . . does not recognize a separate cause of action for breach of the implied covenant . . . when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). Further, a plaintiff may not rely on an implied covenant claim "to create terms that do not exist in the writing." *Vanlex Stores, Inc. v. BFP 300 Madison II, LLC*, 66 A.D.3d 580, 581 (1st Dep't 2009).

MSSB argues that Plaintiffs' implied covenant claim should be dismissed as duplicative of their breach of contract claim. Def. Mem. at 38. The Court disagrees. As discussed above, *see supra* note 6, Plaintiffs have stated a breach of contract claim based on MSSB's promise to pay an interest rate that considers "current market conditions and competitive interest rates."

Plaintiffs, however, may have difficulty in proving this claim at later stages of this litigation should the evidence show that market conditions and competitive interest rates were in fact considered by MSSB in setting the BDP rates, even if they were largely discounted. If MSSB, however, did consider market conditions and competitive interest rates, but then abused its contractual discretion by setting a rate that bore no relation to these factors, such conduct may not violate the contract, but could violate the implied covenant. *Cf. Liberty Cap. Grp.*, 802 F. Supp. 3d at 715 (allowing implied covenant claim at motion to dismiss stage in similar circumstances). Such a finding would not "be inconsistent with [the] terms of the contractual relationship." *Cordero v. Transamerica Annuity Serv. Corp.*, 39 N.Y. 3d 399, 410 (2023). Accordingly, Plaintiffs will be permitted to pursue both their breach of contract claims and their implied covenant claim in the alternative, with the caveat that Plaintiffs will not be allowed to recover on both claims. *See Liberty Cap. Grp.*, 802 F. Supp. 3d at 715 (citing *Spinelli v. Nat'l Football League*, 903 F.3d 185, 206 (2d Cir. 2018)).

MSSB's remaining arguments are similar to its contentions as to the breach of contract claims, so the Court addresses them only briefly. The implied covenant claim is not defeated by MSSB's claim to sole discretion with respect to the BDP rates. *See* Def. Mem. at 39. As the Court has already stated, MSSB does contractually have discretion with respect to the when and how of setting interest rates, but it bounded its own discretion by promising to consider "current market conditions and competitive interest rates." *See* Weinstein Decl. Ex. 2 at 6. MSSB's next argument, that causation is not satisfied, is also rejected because the Court finds that this arguments sounds in mitigation of damages, which is inappropriate to consider at the motion to dismiss stage. *See U.S. Bank Nat. Ass'n*, 696 F. Supp. 2d at 440–41. Finally, MSSB's argument that this claim cannot be sustained because the BDP was only a "tangential aspect of the overall brokerage and advisory contracts" has no basis in the law. Def. Mem. at 40. The Court can find

no support for the proposition that the implied covenant only applies to more significant or less "tangential" terms of a contract as MSSB contends here.

For the aforementioned reasons, MSSB's motion to dismiss Count 3 is denied.

**E. The Breach of Fiduciary Claims Are Dismissed**

Counts Four and Five allege breach of fiduciary duty claims. To plead a claim for breach of fiduciary duty under New York law, Plaintiffs must allege "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020). "Where a fiduciary duty is based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract and must be dismissed." *Northern Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 105 (S.D.N.Y. 2013) (citation modified). Specifically, "a breach of fiduciary duty claim is duplicative when it is based on allegations of fiduciary wrongdoing that are expressly raised in plaintiff's breach of contract claim." *Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 244 (S.D.N.Y. 2014) (citation modified). "Instead, a plaintiff must set forth allegations that, apart from the terms of the contract, the parties created a relationship of higher trust than would arise from their contracts alone so as to permit a cause of action for breach of fiduciary duty independent of the contractual duties." *Ellington Cred. Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 196 (S.D.N.Y. 2011) (quoting *Brooks v. Key Trust Co. Nat. Ass'n*, 26 A.D. 3d 628, 630 (3d Dep't 2006)) (citation modified).

Plaintiffs fail to state a claim for a breach of fiduciary duty that is distinct from the obligations already owed to them by MSSB under the relevant contracts, or otherwise attempt to attribute duties to MSSB that do not apply. As Plaintiffs themselves allege, MSSB purportedly breached its fiduciary duties to Plaintiffs by:

> (i) fail[ing] to pay to or secure for Plaintiffs and the Class a fair or reasonable rate of interest on their free credit balances that properly took into account "current market conditions," "prevailing market conditions," and "competitive interest rates"; (ii) fail[ing] to act in the best interests of Plaintiffs and the Class vis-à-vis the cash sweep program; and (iii) recommend[ing] to Plaintiffs and the Class that they utilize and continue to utilize the Bank Deposit Program.

SACCAC ¶ 197; *see also id.* ¶ 205. The Court fails to see how these alleged breaches of MSSB's obligations are distinct from the obligations already imposed by contract.

Take Plaintiffs' first statement that MSSB breached its duty by failing to set a reasonable rate of interest or one that took into account competitive rates or market factors. This is a precise restatement of Plaintiffs' breach of contract claims. *See id.* ¶ 181 (alleging breach of contract for failure to set rates that accounted for "current market conditions," "prevailing market conditions," and "competitive interest rates"); *see also id.* ¶ 187 (alleging breach for failure to pay a "reasonable rate of interest."). The obligation, if any, that was breached in failing to pay a particular interest rate, then, is entirely subsumed by the breach of contract claims. As to Plaintiffs' second statement that MSSB failed to take Plaintiffs' "best interests" into account, this similarly fails to allege a duty that is distinct from MSSB's alleged contractual obligations. Indeed, MSSB's own contract states that it is required to act in Plaintiffs' best interests, and there is no indication in the Complaint that there is some heightened duty beyond what is already so stated. *See e.g.*, Dameron Decl. Ex. 3 at 4;[8] *see also Ellington Cred. Fund, Ltd.*, 837 F. Supp. 2d at 196 (fiduciary duty claim cannot stand where it alleges no duties beyond contractual obligations).

---

[8] The Court further notes that Plaintiffs have not adequately alleged what MSSB did that was *not* in Plaintiffs' "best interests" beyond failing "to pay reasonable interest rates on its clients' cash balances." SACCAC ¶ 115. Such an allegation is, of course, duplicative not only of the contract claim, but also of the first contention as to how MSSB purportedly breached its fiduciary duties.

Plaintiffs' final allegation, that MSSB breached its duty by "recommend[ing] to Plaintiffs and the Class that they utilize and continue to utilize the Bank Deposit Program," SACCAC ¶ 197, is not plausible and cannot substantiate this claim because the complaint is devoid of allegations that MSSB "recommended" the BDP to its customers. From a review of the SACCAC and the relevant agreements, it appears that the BDP was a default program into which all MSSB clients were enrolled and about which no recommendations were made. *Cf. In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055, at *11 (concluding same based on similar contractual language). Accordingly, to the extent Plaintiffs premise their breach of fiduciary duty claims on alleged recommendations, that contention is rejected because there are no facts alleged that support it.

Plaintiffs raise several additional arguments to prop up their breach of fiduciary duty claims, but none is convincing. First, Plaintiffs argue that MSSB owed them certain duties under an agency theory because MSSB agreed to act as the customer's agent with respect to the BDP. *See* SACCAC ¶ 76; *see also* Opp. Mem. at 37–39; Weinstein Decl. Ex. 2 at 10.[9] As defined therein, however, this agency duty encompassed only the act of setting up Plaintiffs' accounts, and crediting and debiting funds as necessary when Plaintiffs made withdrawals or executed trades. *See* Weinstein Decl. Ex. 2 at 10. There is no duty beyond those basic acts, and the Court rejects any argument that MSSB had "discretion" over the funds in the BDP because such an argument is foreclosed by the express terms contract. *Cf. In re JPMorgan Cash Sweep Program*, 2026 WL 396055, at *10 (finding same in similar cash sweep program); *Dey v. Robinhood Mkts., Inc.*, 780 F. Supp. 3d 882, 890 (N.D. Cal. 2025) (same); *Liberty Cap. Grp.*, 802 F. Supp.

---

[9] Under the BDP disclosures, the agency relationship is defined as encompassing "establishing the Deposit Accounts at each Sweep Bank and depositing funds into, withdrawing funds from and transferring funds among the Deposit Accounts at each Sweep Bank and among the Sweep Banks." There is no grant of discretion in this agency relationship.

3d at 716–17 (same). Plaintiffs do not allege that MSSB did anything unlawful when opening the accounts or moving cash around, or that Plaintiffs were ever unable to access their funds. In short, Plaintiffs' agency theory fails.

To the extent Plaintiffs base their fiduciary duty claims on duties imposed by federal law, such arguments are similarly unpersuasive. *See* SACCAC ¶¶ 94, 102; *see also* Def. Mem. at 35–36. Neither the Regulation Best Interest ("RBI") nor the Investment Advisers Act of 1940 ("IAA") impose duties on MSSB in this context. The RBI "establishes a standard of conduct for broker-dealers and associated persons when they recommend securities transactions or investment strategies to retail customers." *Dey*, 780 F. Supp. 3d at 890. As already discussed, however, MSSB made no "recommendations" as to the BDP; it is simply a default program into which Plaintiffs and the class were enrolled and therefore does not implicate the RBI. *See id.* (reaching same conclusion); *see also Schmidlin*, 2026 WL 847197, at *10–11 (same). Additionally, to the extent Plaintiffs contend that the IAA imposes additional duties, "the IAA confers no private causes of action other than voiding an investment advisor's contract." *Gehring*, 2026 WL 248379, at *10 (citing *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 11–12 (1979)). Plaintiffs do not seek that remedy here; thus, the statute is inapplicable.

Because Plaintiffs have failed to state a claim for breach of fiduciary duty that is not duplicative of their breach of contract claim, Counts Four and Five are dismissed.

**F. Plaintiffs Fail to State a Claim for Unjust Enrichment**

Count Six alleges a claim for unjust enrichment. "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant has benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citation modified). It is relevant to note, however,

that "[t]he theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586–87 (2d Cir. 2006) (quoting *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005)) (citation modified). If a valid and enforceable agreement exists that governs the contractual dispute at issue, this "precludes quasi-contract recovery for events arising out of the same subject matter." *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 20-CV-5015, 2021 WL 3668092, at *10 (S.D.N.Y. Aug. 17, 2021) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987)).

Here, Plaintiffs argue that the Parties dispute the existence, scope, and enforceability of their agreements related to BDP rates. *See* Opp. Mem. at 42. This, however, is contrary to the balance of Plaintiffs' arguments, which rely heavily on their contention that Defendants violated the express and implied terms of the various agreements at issue. *See generally* Opp. Mem. Moreover, Plaintiffs' own cited authority contradicts their position. *Hofmann v. Long Island University*, decided in the context of an implied contract, stands for the proposition that an unjust enrichment claim may survive a motion to dismiss "if there is a dispute over the existence, scope, or enforceability of the ***putative*** contract." No. 22-393, 2024 WL 3262819, at *1 (2d Cir. July 2, 2024) (citation modified). There is no implied contract here — the Parties' dispute is governed by the agreements that both sides agree exist and to which both sides have cited heavily. This precludes the quasi-contract recovery sought by Plaintiffs, and their claims for unjust enrichment are accordingly dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part. Specifically, Defendant Morgan Stanley, MSSB's corporate parent, is DISMISSED from this action. Additionally, the motion is GRANTED as to Counts 4, 5, and 6, and DENIED as to

Counts 1, 2, and 3. Finally, Defendants' motion to STRIKE portions of the Complaint pursuant to Fed. R. Civ. P. 12(f) is DENIED. Because Plaintiffs requested leave to amend in the event the Court granted the motion to dismiss, Opp. Mem. at 44, Plaintiffs may move for leave to amend Counts 4 and 5 no later than **September 25, 2026**; leave to amend Count 6 is denied as futile. If Plaintiffs choose to move for leave to amend, they must include a redlined version of their proposed third amended complaint.

The Clerk of Court is respectfully directed to terminate the open motion at Dkt. 91.

**SO ORDERED.**

**Date: September 8, 2026**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**